IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § CASE NO. 4:19-CR-00450-1 |
| | § HOUSTON, TEXAS |
| VERSUS | § THURSDAY, |
| | § AUGUST 22, 2019 |
| JEFFREY STERN | § 1:12 P.M. TO 4:26 P.M. |

ARRAIGNMENT / DETENTION

BEFORE THE HONORABLE PETER BRAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY:               J. MARCHAND

COURT RECORDER:                 L. HOWARD

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:           U.S. ATTORNEY'S OFFICE
Robert S. Johnson, Esq.
Southern District of Texas
1000 Louisiana Street
Suite 2300
Houston, TX  77002
713-567-9000


FOR THE DEFENDANT:           GERGER KHALIL & HENNESSY
Ashlee Caligone McFarlane, Esq.
David Gerger, Esq.
1001 Fannin
Suite 2450
Houston, TX  77002
713-224-4400

ATTORNEY AT LAW
Dean M. Blumrosen, Esq.
1207 S. Shepherd Drive
Houston, TX  77019
713-524-2225

BENNETT & SECREST, PLLC
George McCall Secrest, Jr. Esq.
1545 Heights Blvd.
Suite 800
Houston, TX  77008
713-757-0679

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| RORBERT SIMPSON | | | | |
| By Mr. Johnson | 15 | . | 128 | . |
| bY mR. bLUMROSEN | . | 95 | . | 132 |

| EXHIBITS: | Admitted |
|---|---|
| GOVERNMENT'S: | |
| Exhibit 1 | 34 |
| Exhibit 2 | 36 |
| Exhibit 3 | 47 |
| Exhibit 4 | 48 |
| Exhibits 5 & 6 | 55 |
| Exhibits 7 through 10 | 63 |
| Exhibit 12 | 67 |
| DEFENDANT'S: | |
| Exhibit 1 | 99 |
| Exhibit 2 | 100 |

CLOSING ARGUMENTS
By Mr. Johnson 138
By Mr. Gerger 141

RULING: 147

<u>HOUSTON, TEXAS; THURSDAY, AUGUST 22, 2019; 1:12 P.M.</u>

THE COURT: All right, Jeffrey Stern.

THE CLERK: He also needs to be arraigned.

THE COURT: All right, do you want to do that first then? Let's do the Arraignment first. Everybody announce your appearances.

MR. GERGER: Sure, David Gerger, Dean Blumrosen, Max Seacrest, and Ashley McFarlane for Jeff Stern, Your Honor.

THE COURT: What was the second name? I'm sorry. I don't remember your name.

MR. BLUMROSEN: Dean Blumrosen.

THE COURT: Just a minute.

(Pause in the proceedings.)

MR. JOHNSON: Robert Johnson for the Government, Your Honor.

THE COURT: All right. Mr. Stern, have you received a copy of the Superceding Indictment?

DEFENDANT STERN: Yes, sir.

THE COURT: And have you read it?

DEFENDANT STERN: I have.

THE COURT: And have you gone over it with your attorneys?

DEFENDANT STERN: I have.

THE COURT: Do you feel like you understand the charges in the Indictment and the maximum possible penalties

1    which we discussed the other day?

2             DEFENDANT STERN:  I do.

3             THE COURT:  All right.  Does Counsel waive formal

4    reading of the Indictment?

5             MR. GERGER:  Yes, Your Honor.

6             THE COURT:  Sir, how do you plead to all the counts

7    in the Indictment against you?

8             DEFENDANT STERN:  Not guilty to all charges.

9             THE COURT:  All right, a not guilty plea will be

10   entered on the Record for you.

11            Your case has been assigned to Judge Rosenthal.

12            Is there a schedule?

13            THE CLERK;  There is, Your Honor.  I need to print

14   it out.  If you give me a few minutes before you start the

15   hearing, by the end of the hearing I'll have it.

16            THE COURT:  We'll give you your schedule while we're

17   doing this and if there's any questions about the schedule, we

18   can -- there's not much I can do about it, but we can talk

19   about it.

20            All right.  Okay.  Have a seat and let's start the

21   hearing.

22            By the way before we do start, everybody start

23   getting seated, but just -- let me just ask has everybody

24   received a copy of the Pretrial Services Report?

25            MR. JOHNSON:  Yes, Your Honor, the Government has.

1      MR. GERGER:  As has the Defendants.

2      THE COURT:  All right.

3      MR. JOHNSON:  And we have one housekeeping matter.

4      THE COURT:  Yeah, let me just do my housekeeping

5  matter.

6      MR. GERGER:  Yes, Your Honor.

7      THE COURT:  Are there any factual inaccuracies in

8  this report?

9      MR. GERGER:  I haven't had a chance to even look at

10 it, so.

11     THE COURT:  Okay, well if you -- while we're going,

12 if you find a factual inaccuracy, will you bring it to my

13 attention?  Otherwise, these facts are part of the Record and

14 you don't need to prove them.  You can argue about them, but

15 you don't need to prove them, so we can just be more

16 efficient.  Okay?

17     MR. GERGER:  Thank you, Your Honor.

18     THE COURT:  All right and go ahead.

19     MR. JOHNSON:  Your Honor, this case presents an

20 unusual circumstance and that is that a large number of the

21 over docs charged in the conspiracy are happening after the

22 Defendant retained counsel and after Counsel had met with the

23 United States Attorney's office.

24     THE COURT:  Okay.

25     MR. JOHNSON:  The danger with that is that there's a

potential that lawyers who are hired to represent him, could then -- could potentially become witnesses to the underlying conduct.  Okay.

So there's one thing that happened.  There was a letter that was sent by Mr. Gerger's law firm to the IRS.  It would be the position of the Government that that letter could be construed as an act in furtherance of a conspiracy.  We're it in now way suggest that Mr. Gerger did anything intentionally wrong, but just that the letter was caused to be sent to the IRS and that act furthered the conspiracy.

So for purposes of the hearing today, we would just like a waiver from the Defendant on the Record that he is waiving any potential conflict issue regarding the sending of that letter.

THE COURT:  I can't make him waive a conflict.

MR. GERGER:  Can I speak to this, Your Honor?

THE COURT:  Sure.

MR. GERGER:  As Mr. Johnson said, in 2017 the civil IRS sent a summons to Mr. Stern to come in and give some evidence about attorney one in the Indictment who hadn't paid his taxes.  They also sent a levy to Mr. Stern saying, if you owed him money, turn it over to the IRS for his taxes.

So I did write letter to the civil IRS saying there's a criminal investigation going on.  He can take a Fifth Amendment to the summons, and let us know if you want to

1  proceed with this summons of levy or withdraw it.

2          And several weeks later, the civil IRS wrote me to

3  say we are withdrawing the summons and the levy.

4          THE COURT:  Okay.

5          MR. GERGER:  So that's what happened.

6          And I have a little letter brief to hand up to the

7  Court.  The law on this is very clear in the Fifth Circuit.

8  And in fact, in this District, none other than Judge Rosenthal

9  and Judge Lake have written opinions on it and it says that

10 this issue becomes ripe only at trial, not before trial.

11         It also says secondly that if there's any other way

12 to present the evidence, if there's another witness like the

13 IRS civil person or a stipulation, you don't get to put

14 opposing counsel on the witness stand.

15         So there are legion of cases rejecting this.

16         THE COURT:  All right, look --

17         MR. GERGER:  So I just want to give you these cases

18 and Mr. Stern is ready to say he is aware of this, we

19 discussed it and he's fine with it.

20         MR. JOHNSON:  And the Government has no problem with

21 Mr. Gerger handling the hearing.  I just don't want there to

22 be a 2255 down the line that suggests that there was an

23 unwaivable conflict at this point.

24         THE COURT:  So here's the thing.  If there's a

25 conflict that counsel knows about, it's counsel's duty to file

a motion to withdraw.

Does everybody agree to that?

MR. GERGER:  We do.

THE COURT:  It's your job.

And I don't have enough facts in front of me to think that there is some sort of lawyer/witness problem.  They sent a letter.  I'm not going to have -- I'm not going to make him waive anything.

And if there's a 2255 later, I mean, you know, I'm not going to try to, you know, undermine a 2255.  I think we should just have the hearing and at a detention hearing you can have people testify to matters that may or may not be admissible at trial.  So there would be no need to have somebody from the other side testify.

So I'm satisfied that we can go forward today. You're saying you're not filing a motion to recuse counsel are you?

MR. JOHNSON:  No.

THE COURT:  And you're not asking to withdraw, are you?

MR. GERGER:  No, Your Honor.

THE COURT:  Then all this is moot.

MR. JOHNSON:  I just wanted to air the issue.

THE COURT:  It's aired, but I don't see the problem. Maybe during the hearing it will hit me.

1       MR. JOHNSON:  Well, the potential problem is this.

2    Mr. Stern -- according to the evidence in our case,

3    Mr. Stern's preferred method of paying his runners -- his

4    legal case runners, is to issue checks in the name of Attorney

5    Roy Abner.

6       The checks are cashed at the check cashier, the cash

7    goes to the runner.  That was happening consistently up until

8    the date the levy was instituted.

9       During the levy period, it stopped and he had to use

10   another method to pay the runners.  The benefit to paying the

11   runners in that method is that he can argue I can write those

12   payments off as business expenses because really they were

13   legal payments to other lawyers, not illegal payments to

14   runners.

15      And so it's in Mr. Stern's interest to get the levy

16   removed, so that he can go back to paying Mr. Abner the way

17   that he likes to, which is exactly what happened once the levy

18   was removed.  Mr. Stern was right back to issuing checks in

19   the name of Mr. Abner and the money goes to Mr. Moore.

20      THE COURT:  So you're not saying that these lawyers

21   had any knowledge of what you think is theory of your case?

22      MR. JOHNSON:  No, no.

23      THE COURT:  Then I don't -- do you agree that

24   there's no problem then?

25      MR. GERGER:  I don't think there's a problem.

1        THE COURT:  All right, then let's have the hearing.

2        MR. JOHNSON:  Okay.

3        THE COURT:  So you know, you-all told me the other

4   day you needed two hours to do this.  And I'm asking you to

5   spend two hours doing this and being reasonable.

6            There are issues in this case that you will need to

7   take up with Judge Rosenthal and a jury some day and that is

8   just for everybody's edification not what we are doing here.

9            This is not a trial.  This is not where we explore

10  all of the ways that you're going to cross-examine witnesses.

11  We are trying to find out whether Mr. Stern can be let out on

12  bail under the law.  Okay?

13       MR. GERGER:  Yes, Your Honor.

14       MR. JOHNSON:  I understand, Your Honor.

15       THE COURT:  So I'm asking everybody to please focus

16  on that.

17       MR. JOHNSON:  Yes, Your Honor.  Thank you.

18       THE COURT:  Okay here's the scheduling order, by the

19  way.  September 23rd is motions.  October 7th is responses to

20  motions.  October 15th, 9:00 o'clock pre-trial conference.

21  Jury selection trial October 21st.

22           What's the estimated time of trial.

23       MR. JOHNSON:  Two weeks.

24       UNKNOWN:  Six.

25       THE COURT:  Just -- it's for docketing and just case

1    management purposes.  That's all.

2            MR. GERGER:  I would say three to four.

3            UNKNOWN:  Six

4            THE COURT:  I'll say three weeks.  You can tell

5    Judge Rosenthal when it gets closer if issues have been

6    narrowed.

7            MR. JOHNSON:  And Judge, regarding your comments on

8    trying to be expeditious in this hearing?

9            THE COURT:  Yes, sir.

10           MR. JOHNSON:  I'll tell you my proposed -- I'm going

11   to call that case agent.  And my proposed line of questioning

12   is to break it into three parts.  First, I'm going to cover

13   just the overall evidence in the case.  I'll try to do it

14   quickly.  I'm not going to pin it up.

15           Secondly, I'm going to cover the overt acts listed

16   in the conspiracy -- some of the overt acts listed in the

17   conspiracy in which we contend the Defendant was creating a

18   fake record, creating a false evidence to obstruct justice.

19           The third part would be to cover the Defendant's

20   destruction of evidence.

21           So there's two sections to the obstruction of

22   justice part of the testimony.

23           THE COURT:  Okay, I understand.  Thank you.

24           MR. GERGER:  To speed it along, we did request early

25   production of *Jencks* and we don't have that, so.

1        THE COURT:  Did you do that?

2        MR. JOHNSON:  No.  The entire point of this hearing

3   is to decide whether the Defendant is a threat to potentially

4   tamper with witnesses, which --

5        THE COURT:  No, no.  What I'm asking is once you've

6   put your case agent up on the stand, they're entitled to get

7   reports that he wrote -- he or she wrote.

8        MR. JOHNSON:  Sure.  They can look at it now.  I

9   have the binder with me.  But I'm not willing to produce it

10  ahead of time and allow potentially the Defendant to look at

11  the reports.  I mean, the whole point of the hearing here is

12  that make sure he doesn't tamper with witnesses in the future.

13       THE COURT:  Yeah, no, no.  They don't get all your

14  witness statements.  That's not what I'm saying at all.

15  *Jencks* requires that after he testifies -- he or she, sorry --

16  you have to give them reports that the agent wrote that

17  pertained to things that the agent did in the investigation.

18       You don't have to turn over reports of other

19  witnesses that haven't testified.  That's not what I'm saying.

20       MR. JOHNSON:  Right.

21       THE COURT:  But what we're going to do today is

22  we're going to have testimony, then you're going to turn over

23  those reports, and then we're going to take -- we're going to

24  have a motion for continuance while they look at the reports.

25  And then we're going to start back up.  Is that what we're

1    going to do?

2            MR. GERGER:  Well, I don't know how much there is.

3            THE COURT:  I don't either.

4            MR. GERGER:  I would say let's start and we'll see

5    what we get.

6            MR. JOHNSON:  Here's what we can do.  There's a lot

7    of reports.  The problem is this agent wrote almost all the

8    reports in that case.  There's a lot of reports.

9            But the reports that relate to the testimony today

10   are the reports of statements by Roy Abner and Fred Morris.

11   They're the two primary cooperators.  There's a third

12   cooperator who's name is Marcus Esquivel (phonetic).

13           THE COURT:  Well all I'm --

14           MR. JOHNSON:  I can group the reports --

15           THE COURT:  -- I have studied this in great detail

16   because this comes up all the time, as you can probably

17   imagine.  And I even have in my handy binder here all of the

18   *Jencks* act cases.  And if they ask for it, you have to

19   produce.

20           MR. JOHNSON:  But I don't believe that's true in the

21   detention hearing.  In the detention hearing --

22           THE COURT:  Oh, absolutely.

23           MR. JOHNSON:  -- the Court has the right to --

24           THE COURT:  No, no, no.  Once they -- once you have

25   somebody testify, *Jencks* requires that the reports that that

1    agent wrote or adopted be turned over.

2          MR. JOHNSON:  I believe that's true at trial,

3    certainly true at trial.  But if you look at the rule it says

4    in the Court's discretion at a detention hearing the *Jencks*

5    material will be turned over.

6          THE COURT:  All right, well let's just see what

7    happens here then.  I'm mean, I'm just telling you, they're

8    entitled to it.  Maybe the timing is off, but they're entitled

9    to it.

10          MR. JOHNSON:  I'll produce it right now.

11          THE COURT:  All right.

12          MR. JOHNSON:  And I can tell them right now the key

13    reports are the Esquivel, Morris and Albert reports.  And that

14    should sufficiently do it.

15          THE COURT:  All right, just put the book away.

16    Let's just have -- let's just do the hearing.  I think I know

17    what the law is.

18          MR. JOHNSON:  Yes, Judge.

19          THE COURT:  All right, call your first witness.

20          MR. JOHNSON:  The Government calls Agent Robert

21    Simpson.

22      (Witness sworn.)

23      (Pause in the proceeding.)

24          MR. JOHNSON:  One moment, Your Honor.  All right,

25    here's the book.

1      (Pause in the proceeding.)

2           MR. JOHNSON:  May I proceed, Your Honor?

3           THE COURT:  Yes, sir.

4                DIRECT EXAMINATION OF ROBERT SIMPSON

5  BY MR. JOHNSON:

6  Q    Sir, would you please state your name for the Court?

7  A    Robert Simpson.

8  Q    Where are you employed?

9  A    I'm a special agent with the Internal Revenue Service

10 Criminal Investigation.

11 Q    How long have you been a special agent with IRS CI?

12 A    Twenty-six years.

13 Q    And what types of investigations do you handle there?

14 A    We conduct investigations into potential criminal

15 violations of Title 26, United States Code, which is the Tax

16 Code, as well as related financial crimes under Title 18, such

17 as money laundering.

18 Q    Where did you receive your education?

19 A    I graduated from the University of Texas at Austin with a

20 degree in finance.

21 Q    Are you familiar with the investigation of Jeffrey Stern?

22 A    Yes.

23 Q    How are you familiar with that investigation?

24 A    I'm assigned that investigation.

25 Q    Are you the lead case agent on that investigation?

1    A    Yes.

2    Q    Approximately when did the Federal Grand Jury

3    investigation start of Mr. Stern?

4    A    Around December of 2015.

5    Q    And how did that investigation come to the possession of

6    IRS CI?

7    A    It was a referral from the Harris County District

8    Attorney's office.

9    Q    Okay, what exactly did they refer?

10   A    They had come into possession of checks drawn on

11   Mr. Stern's law firm accounts that were payable to three

12   attorneys and they had determined that those attorneys did not

13   receive the funds from those checks.

14   Q    What were the names of those three attorneys?

15   A    Roy Abner, Tyrone Moncriffe, and A.J. Broussard.

16   Q    What was the approximate time frame of the checks that

17   the DA's office provided to IRS?

18   A    I believe it was 2009 up through part of 2012.

19   Q    Okay.  Did you obtain additional bank records regarding

20   these checks?

21   A    Yes, yes.

22   Q    How did you do that?

23   A    Via Grand Jury subpoena.

24   Q    Right.  And so with your additional records, what period

25   of time did these checks cover that were going from Mr. Stern

1    to these three attorneys?

2    A    The checks to Mr. Abner -- or pardon me, Mr. Moncriffe

3    and Mr. Broussard ceased in 2010.  The checks payable to

4    Mr. Abner continue into 2019.

5    Q    Were you able to interview these individuals?

6    A    Yes.

7    Q    Okay.  What did Mr. Moncriffe say?

8    A    Mr. Moncriffe stated that he was unaware that any checks

9    from Mr. Stern's law firm had ever been issued in his name,

10   that he didn't receive any funds from the checks, and that he

11   didn't authorize their issuance.

12   Q    Had he ever referred any clients to this law firm?

13   A    He had one or two very small referrals in the past or

14   some business dealings with him, but very minor.

15   Q    And what dollar figure are we talking about per year

16   written to Mr. Moncriffe, ballpark?

17   A    It exceeded a million dollars in one of the years.

18   Q    In what year did you interview him?

19   A    I interview Mr. Moncriffe, I believe, in 2016.

20   Q    Okay, so you're saying that in at least one of the years,

21   there were a million dollars in checks written in

22   Mr. Moncriffe's name from the Stern Law Firm?

23   A    Correct.

24          THE COURT:  May I?  I may have misunderstood.  What

25   is the date range of the checks that were written to

1    Mr. Moncriffe?

2              THE WITNESS:  Late 2008 through the end of 2010.

3              THE COURT:  2010.  Thought you said 2019 somewhere

4    in there?

5              THE WITNESS:  That was to Mr. Abner.

6              THE COURT:  Okay, so I'm sorry --

7              MR. JOHNSON:  Let's go through it individual by

8    individual.

9              THE COURT:  Please.

10   BY MR. JOHNSON:

11   Q    So give us the date range of the checks for

12   Mr. Moncriffe.

13   A    I have records for 2009.  In those records there's a

14   check dated December 31st, 2008.  So at least from

15   December 31st, 2008 up through the end of 2010 -- December

16   2010 for Mr. Moncriffe.

17   Q    Okay, is it possible there were checks before that date,

18   before 2008?

19   A    Yes.

20   Q    Okay.  Did the bank still retain checks that far back?

21   A    No.

22   Q    What is the date range for the checks that you have that

23   were written in the name of Mr. Broussard?

24   A    2009 and 2010.

25   Q    So both of those series of checks to those two

1  individuals stopped in 2010?

2  A    Correct.

3  Q    And then you said there's a third individual who's name

4  checks were written in and that was Mr. Abner?

5  A    Roy Abner.

6  Q    What's the date range for the checks written in the name

7  of Mr. Abner?

8  A    2009 through 2019.

9  Q    And the dollar figures written in the name of Mr. Abner,

10  how does that change over time?

11  A    It increases when the checks to Mr. Moncriffe and

12  Mr. Broussard cease.

13  Q    So those cease in 2010?

14  A    Correct.

15  Q    And then you're saying the dollar amounts written in the

16  name of Mr. Abner go up?

17  A    Correct.

18  Q    And about how much money per year was the Stern Law Firm

19  writing in checks in the name of Mr. Abner?

20  A    In the earlier years, it was several hundred thousand

21  dollars.  One year it was only like 7500, the year that

22  Mr. Moncriffe got most of the money.

23        Then it was several hundred thousand dollars up to --

24              THE COURT:  Can I just correct -- you said when

25  Moncriffe got the money.  Did he get the money?

1          THE WITNESS:  No, he never got the money.

2          THE COURT:  Can you just be more accurate?  Then if

3    he didn't get the money, checks written to, not gotten by.

4    Okay?

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  Go ahead.

7    BY MR. JOHNSON:

8    Q    And then the money -- the amounts of the money written in

9    the name of Roy Abner went up to what?

10   A    Over a million in many of the years, about to about

11   1.6 million.

12   Q    So you said you spoke with Mr. Moncriffe.  Did you also

13   speak with Mr. Broussard?

14   A    Yes.

15   Q    What did he say?

16   A    He said that he was unaware the checks had been written

17   in his name.  He didn't authorize their issuance and he didn't

18   receive any money from the checks.

19   Q    Had he ever made a referral to the Stern Law firm?

20   A    No.

21   Q    Is Mr. Moncriffe still alive and able to testify?

22   A    Yes.

23   Q    Is Mr. Broussard?

24   A    No, unfortunately he passed.

25   Q    Now at this time, did you also try to speak with

Mr. Abner?

A    Yes.

Q    And this time period we're talking about, is this
approximately October 2016?

A    Yes.

Q    And what was Mr. Abner's response when you asked to speak
with him?

A    Well, I never actually met with him.  I went to his
residence and left a business card.  And from there, it was
always through his counsel.

Q    What was the date that you left the business card with
Mr. -- at Mr. Abner's residence?

A    October 31st, 2016.

Q    Did you just leave it under the mat or did you leave it
with a person?

A    I left it with an individual that answered the door at
his house.

Q    And through Mr. Abner's counsel, was he willing to speak
to you?

A    He was not.

Q    Where were these three -- where were the checks to these
three individuals negotiated?

A    They were predominantly negotiated at a check cashing
business called "Brother's Check Cashing," also known as
"Sonny's."

1    Q    Where was that located?

2    A    The primary location was on West Gray in Houston.

3    Q    And did you subpoena records from the check cashing

4    establishment?

5    A    Yes.

6    Q    Did you find those checks in the bank records of the

7    check cashier?

8    A    Yes.

9    Q    And did you find anything unusual notated on those

10   checks?

11   A    On several of the checks there was notation that read

12   either Fred or the letter F written on the front of the check

13   or on the rear of the check near the endorsement.

14   Q    Who's the owner of Brother's Check Cashing?

15   A    Irving Gerber.

16   Q    Eventually were you able to speak with Mr. Gerber?

17   A    Yes.

18   Q    And is it Gerber or Gerger?

19   A    Gerber, G-E-R-B-E-R.

20   Q    All right.  And what did Mr. Gerber say when you spoke

21   with him?

22   A    He indicated that Frederick Morris would bring in checks

23   from the Stern Law Firm payable to Roy Abner and others and

24   that he would negotiate the checks for Mr. Morris, that he

25   would return some of the cash to Mr. Morris, and the remainder

1    of the cash was left essentially on deposit at the check

2    cashing establishment for other people to come and pick up at

3    Mr. Morris' direction.

4    Q    How did Mr. Morris leave cash for others at the check

5    cashing establishment?

6    A    He would leave it in an envelope with somebody's name

7    written on the front and then that person would show up later

8    and pick up their envelope.

9    Q    Okay.  And did he explain the F or the -- did he explain

10   the F or the Fred that was notated on some of these checks?

11   A    Oh yes.  Mr. Gerber indicated that that meant that Fred

12   Morris had cashed the check.

13   Q    Okay.  For the checks that did not have an F for Fred

14   does that mean that someone else had cashed the checks?

15   A    No.

16   Q    Okay.  Just sometimes it got notated on the checks and

17   sometimes it didn't?

18   A    Correct.

19   Q    Did he say whether or not it was always Fred Morris who

20   cashed these checks that were made out in the names of these

21   three people?

22   A    It was always Mr. Morris as it relates to the Moncriffe

23   and Broussard checks.  And it was almost always Morris as it

24   relates to the Abner checks.

25   Q    So from your investigation, who is Fred Morris?

1    A    Fred Morris is a case runner for Mr. Stern and others.

2    Q    Who else does he run cases for?

3    A    Roy Abner.

4    Q    And what is a case runner?

5    A    A case runner is an individual that essentially sells

6    potential personal injury clients for a kickback to personal

7    injury attorneys.

8    Q    And is that a legal or illegal activity under Texas law?

9    A    It's illegal.

10   Q    Who did Mr. Morris sell most of his cases to?

11   A    The Stern Law Firm.

12   Q    And from your -- in your investigation did you determine

13   how much money the Stern Law Firm pays Mr. Morris each year

14   for his case running activities?

15   A    It's based largely on the checks issued to A.J.

16   Broussard, Tyrone Moncriffe or Roy Abner.

17   Q    And about how much is that?

18   A    In excess of a million dollars a year in most years.

19   Q    Was there a recording made that also substantiated that

20   figure?

21   A    Yes.

22   Q    Okay, who is the recording of?

23   A    Of Frederick Morris.

24   Q    And what did he admit on the recording?

25   A    He stated to Roy Abner that the Stern Law Firm had paid

1    him, meaning Mr. Morris, approximately a million dollars in
2    2017.
3    Q    Does Mr. Morris do anything for the Stern Law Firm that
4    you know of, other than run cases?
5    A    No.
6    Q    Now before Mr. Morris became a case runner, what did he
7    do professionally?
8    A    He was a meat cutter at Randall's.
9    Q    What's his education level?
10   A    He's a high school graduate.
11   Q    Can you describe the house that he lives in right now?
12   A    It's about a $1.2 million house in Missouri City.
13   Q    What kind of car does he drive?
14   A    Cadillac Escalade and a Porsche Panamera.
15   Q    Eventually did Mr. Abner cooperate in the investigation?
16   A    Yes.
17   Q    And why did Mr. Abner eventually agree to cooperate?
18   A    He was granted immunity from prosecution.
19   Q    What did Mr. Abner tell you?
20   A    He said that in or around 2006, Frederick Morris came to
21   him and said that Mr. Stern had told Mr. Morris that if
22   Mr. Morris wanted to continue getting paid by the Stern Law
23   Firm, he had to come up with an attorney to whom the check
24   could be issued.
25        They decided that the checks would be issued in the name

1     of Roy Abner and commencing about that time Mr. Stern would

2     write checks payable to Roy Abner, that would be negotiated by

3     Fred Morris and Fred Morris would use the cash from those

4     checks to pay himself and other runners for referring cases to

5     the Stern Law Firm.

6     Q    Did Morris have other runners who essentially worked for

7     him?

8     A    Yes.

9     Q    So Morris would pay some of his money to these other

10    runners who had brought cases into the Stern Law Firm?

11    A    Correct.

12    Q    Now, why was Mr. Abner willing to agree to this scheme?

13    Why did he agree to have his name used in this scheme?

14    A    Well initially he's a -- first of all, he's long time

15    friend of Mr. Morris.  They're childhood friends.  And

16    initially the part of the plan or the scheme was that

17    Mr. Stern was not going to issue Forms 1099 to Mr. Abner or

18    the IRS.

19         So essentially nobody would know that these checks were

20    being issued.

21    Q    Okay, what's a Form 1099?

22    A    Form 1099 is just an information document that's required

23    to be filed with the Government for payments over a certain

24    amount to vendors or individuals that are issued by a

25    business.

1    Q    Okay.  So if Mr. Stern had issued Forms 1099 to the IRS

2    for these payments that were allegedly made to Mr. Abner,

3    Mr. Moncriffe, and Broussard, what would happen at the IRS?

4    What would that trigger at the IRS?

5    A    Well it would indicate at the IRS that those three

6    individuals had received that income and if their returns

7    didn't match it, that would create a problem for those three

8    individuals.

9    Q    Did Mr. Stern have the ability to issue Forms 1099 to

10   Moncriffe and Broussard?

11   A    Yes.

12   Q    And did he?

13   A    He did not.

14   Q    Now, did they ever receive Forms 1099 from the Stern Law

15   Firm?

16   A    No.

17   Q    Okay.  And if they had, what would that have indicated to

18   them?

19   A    Presumably the checks had been issued in their name.

20   Q    And did Mr. Stern tell Mr. Abner whether or not he was

21   going to issue 1099s in Mr. Abner's name?

22   A    I don't know that he ever expressed that directly to

23   Mr. Abner, but that was the understanding amongst the three

24   gentlemen.

25   Q    That Forms 1099 would not be issued for the payments

1    allegedly made to Mr. Abner?

2    A    Correct.

3            THE COURT:  Who made that agreement?

4            THE WITNESS:  Fred Morris, Jeffrey Stern, and Roy

5    Abner.

6    BY MR. JOHNSON:

7    Q    Now at some point did the contours of the scheme change?

8    A    Yes.

9    Q    When was that?

10   A    Around 2010.

11   Q    And what was going on with Mr. Stern in 2010?

12   A    There was an IRS Civil Audit commenced of his tax

13   returns.  There were a couple findings from those audits, one

14   of which was that he had diverted business income to his

15   personal accounts and then failed to report that income on his

16   tax returns.

17           And also that he was not properly issuing Forms 1099 to

18   individuals he had paid money to.

19   Q    Did he pay a penalty based on the failure to issue the

20   Forms 1099?

21   A    Yes, he did.

22   Q    And did he pay that penalty for just one tax year?

23   A    He agreed to pay it for one year, and then an agreement

24   was made with the IRS to pay the same amount for two

25   additional years in lieu of conducting full audits on those

1    years.

2    Q    Okay, so by agreeing to pay the fines for these other two

3    years, it caused those other two years to not be audited?

4    A    Correct.

5    Q    And did he also pay any fines regarding the diversion of

6    income?

7    A    Yes, he paid a fraud penalty of approximately $300,000.

8    Q    Did he sign a form in conjunction with paying that fraud

9    penalty?

10   A    Yes, he agreed to the fraud penalty.

11   Q    And at that time, how did the IRS determine that he was

12   diverting income?

13   A    Based on an audit, they had obtained his bank accounts

14   and saw that there were business funds deposited to his

15   personal accounts that weren't reflected on the tax returns.

16   Q    In your investigation, did you find that Mr. Stern was

17   diverting money and hiding it from the IRS in another way?

18   A    Yes.

19   Q    How is that?

20   A    Well, there was some funds that were diverted to the

21   check cashier, as well as non-deductible expenses specifically

22   fraudulent referral fee deductions for the checks issued to

23   Mr. Abner and others.

24   Q    Okay.  So, you mentioned that the scheme changed in 2010?

25   A    Yes.

1    Q    Okay, tell us how the scheme changed.

2    A    Well once he was put on notice about issuing Forms 1099,

3    the checks to Mr. Moncriffe and Mr. Broussard ceased.  And the

4    checks to Mr. Abner continued, but Mr. Abner now began

5    receiving Forms 1099.

6         So meetings were held amongst Mr. Abner, Mr. Morris, and

7    Mr. Stern in which it was agreed that Mr. Abner would file tax

8    returns, claiming as income the amount of checks that had been

9    written to him from the Stern Law Firm even though he didn't

10   receive the money.

11        And that it would be the responsibility of Stern and

12   Morris to pay the resulting tax liabilities.

13   Q    That agreement was reached approximately when?

14   A    Approximately 2012.

15   Q    And is that approximately when Stern began issuing

16   Forms 1099 to Mr. Abner?

17   A    Yes.  It would be for the 2011 tax year, but it was

18   issued in 2012.

19   Q    All right, now eventually did Mr. Morris agree to

20   cooperate in the investigation?

21   A    Yes.

22   Q    And did you interview Mr. Morris?

23   A    Yes.

24   Q    What did he say?

25   A    Corroborated exactly what Mr. Abner said that Mr. Stern

1    had approached him and said that if he wanted to continue

2    getting paid, he'd have to get an attorney's name in which to

3    issue the checks.  He enlisted Roy Abner.  From that point

4    forward, Mr. Stern began writing checks to Mr. Abner, which

5    Mr. Morris would cash and retain the cash for himself and

6    others.

7         He added that at some point the scheme expanded where

8    Mr. Stern would also write checks to Moncriffe and Broussard.

9    However, those two gentlemen were unaware of it.

10   Q    Did Mr. Morris explain the mechanism by which he was paid

11   by the Stern Law Firm?

12   A    Yes.

13   Q    What is that?

14   A    He would receive generally an advance on a case, which

15   was $1,000 for a regular personal injury automobile case.  If

16   it was a commercial case -- meaning that the at fault party

17   carried an insurance policy -- the up front payment would be a

18   little more, maybe two and a half or three and a half thousand

19   dollars.

20        And then on the back end -- meaning at the time the case

21   settled -- Mr. Stern would pay a kickback of 50 percent as

22   attorney fees to Mr. Morris via checks payable to Roy Abner.

23   Q    Do you know if the Texas Bar Rules permit fee splitting

24   between attorneys and non-attorneys?

25   A    They do not.

1    Q    And so in order to get paid, what did Mr. Morris usually

2    do?

3    A    When he was getting paid up front, he would submit a

4    request in writing.  He would write down the clients on a

5    sheet of paper and the amount that they needed to be advanced

6    for their case and sum the total and submit it to the Stern

7    Law Firm to get paid.

8    Q    And who did he deliver those document requests to?

9    A    He generally delivered it to Mr. Stern.  However, if

10   Mr. Stern was out of town or otherwise unavailable, he would

11   deliver it to Rosemary Wilsusen.

12   Q    Who is Rosemary Wilsusen?

13   A    She is currently the office manager at the Stern Law

14   Firm -- or executive director.

15   Q    So, this request is basically an invoice; is that what it

16   is?

17   A    More or less, yes.

18         MR. JOHNSON:  May I approach, Your Honor?

19         THE COURT:  Yes, sir.

20   BY MR. JOHNSON:

21   Q    I'm handing you now what's been marked as "Government's

22   Exhibit 1" -- actually it's 1 and 2.  And once you're done

23   testifying about it, you can hand your copy to the Court so

24   the Court can see it.

25         What is Government's Exhibit 1?

1    A    Government's Exhibit 1 is a print out of a text message

2    photo that was sent from Fred Morris' telephone to Rosemary

3    Wilsusen's telephone.

4    Q    Why was Mr. Morris sending a text message photo to

5    Mr. Wilsusen -- Ms. Wilsusen?

6    A    So that he could receive kickbacks on the cases that are

7    listed on this piece of paper.

8    Q    Okay, so is this how Mr. Morris would usually deliver his

9    check request to the Stern Law Firm?

10   A    Yes.

11   Q    If Stern was there, would he deliver the request in

12   person to Mr. Stern?

13   A    Yes.

14   Q    What about when Mr. Stern was out of town?

15   A    He would communicate with Rosemary Wilsusen.

16   Q    Okay.  And sometimes deliver it by text message?

17   A    Yes.

18   Q    And so what is -- can you describe Government's Exhibit 1

19   for us?  What is this?

20   A    Yes.

21            THE WITNESS:  Your Honor, would you like to see it?

22            THE COURT:  Are you offering it?

23            MR. JOHNSON:  Yes, we're offering.  I'm sorry, Your

24   Honor.  The Government offers Government Exhibit 1.

25            THE COURT:  Is there an objection?

1           MR. BLUMROSEN:  No objection.

2           THE WITNESS:  On the left hand column --

3           THE COURT:  It's admitted.

4       (Government's Exhibit 1 is admitted.)

5           THE WITNESS:  -- there are numbers from one to 3.5.

6   That's the amount of the kickback.  And then there's a list of

7   client names.  And off to the right, that is the Stern Law

8   Firm case number.

9           And then at the bottom the 12,500 figure is the sum

10  of the 3.5's and the 1's indicating $12,500.  And then

11  indicating that the check should be payable to Roy Abner.

12  BY MR. JOHNSON:

13  Q   All right, so that three point -- if you look at the

14  first line, there's a letter C and then it says 3.5.  What

15  does the C and 3.5 indicate?

16  A   The C indicates commercial and 3.5 indicates $3,500.

17  Q   And that's the initial kickback owed to Mr. Morris for

18  that commercial referral?

19  A   Correct.

20  Q   And then the next two lines down -- where it says "Melvin

21  Hicks," it has a one in that column.  What does the one

22  indicate?

23  A   That indicates $1,000.

24  Q   So if you add up the numbers in the left column, what do

25  they equal?

A    12,500 or 12.5.

Q    All right.  And so is then a request for a check -- a kickback check from the Stern Law Firm for $12,500 made out in the name of Roy Abner?

A    Yes.

Q    What is the date of this text message that was sent to Rosemary Wilsusen?

A    It was sent on May 25th.

Q    Okay.  And if you look at --

THE COURT:  May 25th what year?  Does it matter?

BY MR. JOHNSON:

Q    Do you have Government's Exhibit 2 there?

A    I believe -- I don't.

Q    Does the Judge have it?

A    It's the same date of the check in Exhibit 2 is issued.

MR. JOHNSON:  All right, Your Honor, the Government moves to admit Government's Exhibit 2.

MR. BLUMROSEN:  No objection.

THE COURT:  Admitted.

(Government's Exhibit 2 is admitted.)

THE WITNESS:  It was -- the text message was sent May 25th, 2016.

BY MR. JOHNSON:

Q    All right.  And then what day did the -- was there a check then issued to -- in the name of Mr. Abner?

1   A    Yes.

2   Q    For how much money?

3   A    $12,500.

4   Q    On what day?

5   A    May 25th, 2016.

6   Q    All right.  That's the same day that the request came in?

7   A    Correct.

8   Q    Where was this check negotiated?

9   A    It was negotiated at Señor Check Cashing.

10  Q    And what is Señor Check Cashing?

11  A    It was a check cashing establishment that was utilized by

12  Mr. Morris and others to negotiate checks after Brother's

13  Check Cashing closed.

14  Q    The -- if you look back at Government's Exhibit 1, the

15  numbers in the right-hand column on the page, you said those

16  are Stern office case numbers?

17  A    Correct.

18  Q    And some of them have a suffix of .23 and some have a

19  suffix of .22.

20  A    Correct.

21  Q    What do those numbers refer to?

22  A    The .23 refers to a commercial case and the .22 refers to

23  a non-commercial or regular case.

24  Q    Did you determine whether the people listed on this page

25  are actual Stern Law Firm clients?

1    A    Yes.  For several of them I was able to establish via

2    Court filings that they were represented by the Stern Law

3    Firm.

4              THE COURT:  Is this mine or?

5              MR. JOHNSON:  Yes.

6              THE COURT:  Okay, thanks.

7         (Pause in the proceeding.)

8    BY MR. JOHNSON:

9    Q    All right, so what does the -- Mr. Morris was charged in

10   this Indictment, correct?

11   A    Yes.

12   Q    What is the status of his case?

13   A    He has pleaded guilty to the conspiracy, Count 1.

14   Q    And who did he agree -- who did he plead guilty to

15   conspiring with?

16   A    Jeffrey Stern and others in the Indictment.

17   Q    Were you in the courtroom when Mr. Morris pled guilty?

18   A    Yes.

19   Q    And was there a detailed factual basis read into the

20   Record?

21   A    Yes.

22   Q    Did he swear under oath that the facts read into the

23   Record were true and correct?

24   A    He did.

25   Q    And do those facts that are in the Plea Agreement agree

1   with your testimony today about what Mr. Abner and Mr. Morris
2   told you?

3   A    Yes.

4   Q    Did you conduct any searches in this case?

5   A    We did.

6   Q    What did you search?

7   A    We searched three storage units at a storage lot called
8   "Great Value Storage" in Southwest Houston.

9   Q    What did you believe was stored in these storage units?

10  A    Books and records of the Stern Law Firm.

11  Q    Who's name was the storage unit rented in?

12  A    The storage units were rented in the name of a gentleman,
13  Fidel Jiminez.

14  Q    Who's Fidel Jiminez?

15  A    Fidel Jiminez is a handyman construction worker, who is
16  in the US illegally, or was at the time.

17  Q    How difficult was it for you to find this storage unit
18  where the Stern Law Firm records were kept?

19  A    Well initially I had a lead on where the storage units
20  might be located and I went to several storage facilities in
21  the area seeking units rented by Jeffery Stern, but didn't
22  find any.

23       I later learned of the existence of Mr. Jiminez, so I
24  redoubled and went back to the storage facilities asking for
25  units rented by Mr. Jiminez and I located these three units

1  which were rented by Mr. Jiminez, but paid for by Mr. Stern.

2  Q    Were there records and documents of Great Value Storage

3  showing that Mr. Stern had been the one actually paying for

4  the storage units?

5  A    Yes.

6  Q    In your 26 years of investigation with IRS CI, have you

7  investigated attorneys in the past?

8  A    Yes.

9  Q    Have you ever seen a law firm store its corporate -- its

10  client files and financial files in a storage unit held in the

11  name of an illegal alien construction worker?

12  A    No.

13  Q    That's an unusual storage solution for a law firm; isn't

14  it?

15  A    That is unusual.

16  Q    And did it interfere with your ability to find the Stern

17  Law Firm records?

18  A    It did.

19         THE COURT:  May I ask what -- when was this -- these

20  search warrants, when were they executed, please?

21         THE WITNESS:  July of 2017.

22         THE COURT:  Thank you, go ahead.

23  BY MR. JOHNSON:

24  Q    Were you able to obtain Mr. Stern's tax returns?

25  A    Yes.

1    Q    And what -- actually let me step back one second.

2         What -- did you obtain any documents from the search of

3    the Stern files that proved useful in your investigation?

4    A    Yes.  We were able to obtain copies of check stubs,

5    financial records, general ledgers, general bookkeeping

6    records of the law firm.

7    Q    And you said that you were able to obtain the Stern tax

8    returns, correct?

9    A    Correct.

10   Q    When you examined the tax returns, did you find any

11   problems with the tax returns?

12   A    Yes.

13   Q    And what were those generally?

14   A    There -- depending on the years we're discussing, there's

15   years of -- that contain unreported income.  All the years

16   contain fraudulent expenses to include fraudulent referral fee

17   expenses for kickbacks paid to runners, fraudulent referral

18   fee expenses for loans made to individuals, and fraudulent

19   advertising deductions for loans made to individuals.

20   Q    And so what tax years were you able to determine that

21   fraudulent returns were filed by Mr. Stern?

22   A    Based on the records obtained at the search warrant,

23   combined with the tax returns, we were able to establish that

24   the false referral fee deductions were, in fact taken for

25   2011, 2012, 2013, 2014, and 2015.

1    Q    And are you limited in your ability to determine whether

2    other tax years had the same illegal deductions taken, based

3    on the records you obtained or didn't obtain in the search?

4    A    Yes.

5    Q    Now, are illegal payments for kickbacks, are those

6    deductible expenses under the US Tax Code?

7    A    They are not.

8    Q    In examining Mr. -- so I take it, some of the -- some of

9    the illegal deductions involved payments that were made to

10   Mr. Morris by issuing checks in the name of Roy Abner?

11   A    Yes.

12   Q    Okay.  Did you find other illegal deductions that were

13   taken in those tax returns?

14   A    Yes, there were also illegal referral fee deductions for

15   kickbacks paid to Marcus Esquivel which had been routed

16   through Attorney Rick Plezia. And illegal kickback payments to

17   Lamont Ratcliff that had been routed through Attorney Deborah

18   Bradley.

19   Q    Who is Marcus Esquivel?

20   A    Marcus Esquivel is a case runner.

21   Q    Did Marcus Esquivel cooperate in the investigation?

22   A    Yes, he did eventually.

23   Q    And what did he tell you?

24   A    That he made a living running cases.  He sold cases to

25   Mr. Stern and others.  He sold cases to Mr. Stern for many,

many years prior to 2010.  He was generally paid cash.  He

later negotiated an arrangement where he would receive cash up

front and then a 20 percent kickback of Mr. Stern's attorney's

fees on commercial cases when the case settled.

And that's how he made his living.

Q    Okay.  At some point did the arrangement with

Mr. Esquivel change?

A    Yes.

Q    When was that?

A    Around 2010.

Q    All right, and 2010 is the year of the civil audit?

A    Correct.

Q    And how did the arrangement with Mr. Esquivel change?

A    Well, due to the audit and other factors, they kind of

put their relationship on pause for awhile.

Q    When you say, "they," you mean Mr. Esquivel and

Mr. Stern?

A    Correct.  And so Mr. Esquivel essentially just stayed

away from Mr. Stern for awhile and began running cases for

Mr. Plezia and others.

Mr. Stern and Mr. Esquivel resumed their relationship in

early 2011.  And it was at that point that they decided that

the kickbacks to Mr. Esquivel would be routed through Rick

Plezia.

Q    And what is the potential tax advantage of Mr. Stern of

1    routing kickbacks through Mr. Plezia?

2    A    He can deduct the checks to Mr. Plezia as allowable

3    referral fee expenses to another attorney.

4    Q    And are those allowable referral fee expenses when the

5    money is ultimately going to a runner, Marcus Esquivel?

6    A    No.

7    Q    And so can you describe for the judge the pattern of

8    payments between Stern, Plezia, and Esquivel?

9    A    Generally Mr. Stern would issue a check payable to

10   Mr. Plezia.  Mr. Plezia would deposit it to one of his law

11   firm accounts, and usually within a day or two at the most, he

12   would write a check for generally the exact same amount.

13   Sometimes it would $1,000 less or $2,000 less to one of

14   Mr. Esquivel's business entities.

15   Q    And did Mr. Esquivel confirm that all these payments made

16   to Mr. Plezia were for case running?

17   A    Yes.

18   Q    Meaning specific referrals of clients for the Stern Law

19   Firm?

20   A    Correct.

21   Q    And did Mr. Esquivel provide any documents that backed up

22   his statements?

23   A    He did.

24   Q    What were those documents?

25   A    He provided ledgers that he maintained of his case

referrals to Mr. Stern and the advances and kickbacks that he

received from Mr. Stern.

Q    Do those ledgers have Stern client names in them?

A    Yes, they do.

Q    And do they have amounts of money listed?

A    Yes, they do.

Q    Do the ledgers link the Stern client name and the amount

of money in the ledger -- can you link the Stern client name

and the amount of money in the ledger with bank records that

you've recovered?

A    Yes, you can match many of the amounts listed in the

ledger near the Stern client names to a check issued by

Mr. Stern to Mr. Plezia.

          THE COURT:  How do you spell Plezia, please?

          THE WITNESS:  P-L-E-Z-I-A.

          THE COURT:  Thanks.

BY MR. JOHNSON:

Q    You also mentioned that Mr. Stern paid a runner named

Lamont Ratcliff and improperly deducted those payments?

A    Yes.

Q    How did Mr. Stern make those payments?

A    He would issue a check payable to Deborah Bradley, who

was an attorney that worked at the Stern Law Firm.

Ms. Bradley would deposit that check to one of her bank

accounts and then the same day issue a check to Mr. Ratcliff's

business entity, which was called "Gulf Coast Wellness Rehab,"
or commonly referred to as "Wellness."

Ms. Bradley would just write a check to Wellness the same
day she received a check from Mr. Stern.

Q    So basically the same arraignment as with Mr. Plezia and
Mr. Esquivel?

A    Correct.

Q    And did you determine that Mr. Stern was also issuing
kickback checks to Mr. Morris through a different mechanism
other than writing checks in the name of Mr. Abner?

A    Yes.

Q    In what way was that?

A    At times during 2011 and 2016, Mr. Stern issued checks
payable to First Quality Healthcare, which was a clinic
controlled by Mr. Morris' wife.  He would give those checks to
Mr. Morris.  Mr. Morris would cash them at the check cashier
and use the cash to pay himself and others' kickbacks.

However, Mr. Stern deducted the amount of those checks as
medical expenses on his tax returns.

Q    Did Mr. Morris admit that that company filed false tax
returns?

A    Yes.

Q    And that those false tax returns included -- improperly
included the money from Mr. Stern that actually went to
Mr. Morris and not to that company?

1    A    Correct.

2    Q    And did those company -- corporate tax returns also

3    include false expenses?

4    A    Yes.

5    Q    Okay.  So now we've been basically conducting the general

6    overview of the evidence.  Now I want to focus in on some

7    particular transactions that occurred after Mr. Stern became

8    aware of the federal investigation.

9    A    Okay.

10          MR. JOHNSON:  May I approach, Your Honor?

11          THE COURT:  Yes.  You can just always approach.

12          MR. JOHNSON:  Thank you, Your Honor.

13   BY MR. JOHNSON:

14   Q    I'm handing you now what's been marked as "Government's

15   Exhibit 3."  And what is Government's Exhibit 3?

16   A    It is a subpoena issued to the accounting firm of

17   Bernstein and Toy, PC, which sought records from Bernstein and

18   Toy relating to the preparation of tax returns for Jeffrey

19   Stern and other entities.

20          MR. JOHNSON:  Your Honor, I move to admit

21   Government's Exhibit 3.

22          THE COURT:  Any objection?

23          MR. BLUMROSEN:  No objection.

24          THE COURT:  All right it's admitted.

25       (Government's Exhibit 3 is admitted.)

BY MR. JOHNSON:

Q    And it sought tax returns related to who?

A    It sought information relating to tax return preparation

for Jeffrey Stern and related entities.

Q    Okay.  Approximately when was the Bernstein and Toy

subpoena served?

A    It was served on or around September 19th, I believe,

2016.

Q    Bernstein and Toy is the tax preparer for Mr. Stern?

A    Yes.

Q    Are they the preparer who prepared the false tax returns

that are listed in the Indictment?

A    Yes.

        THE COURT:  Can I see that exhibit, please?

        Thanks.  Go ahead.

        MR. JOHNSON:  Thank you, Your Honor.

BY MR. JOHNSON:

Q    I'm handing you now what's been marked as "Government's

Exhibit 4."  What is that document?

A    It appears to be an email from David Gerger to you,

Robert Johnson.

Q    All right, does it relate to Mr. Gerger representing

Mr. Stern in this investigation?

A    Yes.

        MR. JOHNSON:  Your Honor, the Government moves to

1    admit Government's Exhibit 4.

2            THE COURT:  Any objection?

3            MALE SPEAKER:  No objection.

4            MR. BLUMROSEN:  No objection, Your Honor.

5            THE COURT:  All right, it's admitted.

6        (Government's Exhibit 4 is admitted.)

7    BY MR. JOHNSON:

8    Q    And what is the date of that email?

9    A    Friday, September 23rd, 2016.

10   Q    So is it safe to say that at least by that date,

11   September 23rd, 2016, Mr. Stern knows that there is (a) a

12   Grand Jury investigation; (b) that it involves him and his

13   retained counsel --

14   A    Yes.

15   Q    -- in that investigation?

16   A    Yes.

17   Q    And that Counsel has been in contact with the United

18   States Attorney's Office?

19   A    Yes.

20   Q    All right.  So now let's look at the overt acts of the

21   conspiracy that occurred after that date, after his attorney's

22   had met with the United States Attorney's Office.

23           So if you'll look at the Indictment --

24   A    Mr. Johnson, would you hand me my copy of the Indictment?

25   It's sitting over there?

1    Q    Oh, I'm sorry.

2    A    Thank you.

3    Q    Let's start at paragraph 84.

4    A    Okay.

5    Q    And so basically what is described in the Indictment at

6    paragraphs 84 through 88?

7    A    It describes activity between November 4th and

8    November 11th, 2016 in which five years' worth of tax returns

9    for Roy Abner were prepared and filed with the IRS.  Each of

10   those returns falsely indicated that Mr. Abner had received

11   the funds and the checks payable to him from Mr. Stern and

12   contained false expenses to offset large portions of that

13   alleged income to reduce the tax liability.

14   Q    Did you discuss with Abner, Morris, and others how these

15   tax returns were prepared?

16   A    Yes.

17   Q    What did they say?

18   A    It's kind of a long process.  Originally there was a

19   meeting with Mr. Stern, Mr. Morris, and Mr. Abner at a couple

20   meetings where they generally discussed that this would

21   happen.  Mr. Morris --

22   Q    I'm sorry, when you say "this would happen" that false

23   returns would be prepared in the name of Mr. Abner?

24   A    That Mr. Abner would declare the income for all the

25   checks that had been issued in his name.

1    Q    And Mr. Stern was part of that decision?

2    A    Yes.  So following that, Mr. Morris introduced Mr. Abner

3    to a tax return preparer by the name of Jimmy Coleman.  Over a

4    course of many, many months -- in fact, more than a year,

5    starting in 2012, they did prepare some returns for Mr. Abner.

6    And then Mr. Abner failed to file returns for many years up

7    until this time.

8         Starting November 4th, 2016 through the 11th, he filed

9    five years' worth of tax returns.

10   Q    And what was Mr. Abner's involvement in preparing his

11   returns for tax years 2011, '12, '13, '14, and '15, which are

12   the returns filed between November 4th and November 11th,

13   2016?

14   A    Virtually none, other than signing the return if it

15   required a signature.

16   Q    He didn't provide expense information to Mr. Coleman?

17   A    He did not.

18   Q    He didn't provide income information?

19   A    He did not.  Not for these years.  Very limited

20   information, if any, regarding income.

21   Q    Then where did the income figures come from in the

22   returns?

23   A    It came largely from IRS transcripts, which indicated the

24   1099s that had been issued to Mr. Abner.

25   Q    By the Stern Law Firm?

1     A     And others, yes.

2     Q     Okay.  So if the 1099's from the Stern Firm were false,

3     falsely attributing income to Mr. Abner, then did that false

4     income end up on Mr. Abner's returns?

5     A     Yes.

6     Q     And where did the expenses come from on the returns?

7     A     They were essentially made up.

8     Q     And so what was happening in this investigation -- in the

9     Federal Investigation right before these returns were filed?

10          THE COURT:  Let me just ask.  This agreement to

11    prepare these tax returns between Mr. Stern, Morris, and

12    Abner, when did that take place?

13          THE WITNESS:  It began in 2012.

14          THE COURT:  But all these say 2016, as when they're

15    actually filed?

16          THE WITNESS:  Correct.

17          THE COURT:  Okay, fine.  Go ahead.

18    BY MR. JOHNSON:

19    Q     Were there some returns filed before 2016?

20    A     Yes.

21    Q     And what tax years were those?

22    A     I believe it was only 2009 and 2010.

23    Q     And when were they filed?

24    A     In 2014.

25    Q     And I asked you to focus on just the events that happened

1    after the time Mr. Stern knew for certain that he was under

2    Federal Criminal investigation.

3    A    Right.

4    Q    Okay.  All right, so let's keep going.  What happened

5    right before these returns are filed?

6    A    Well, Bernstein and Toy had been subpoenaed in late

7    September.  Also, around September 27th, a subpoena was issued

8    to First Quality Healthcare.

9    Q    Is that Fred Morris' wife's company?

10   A    Correct.  Mr. Morris later indicated to us that he

11   informed Mr. Stern of the issuance of that subpoena.

12   Q    Was that subpoena seeking documents related to Mr. Stern?

13   A    Yes.

14   Q    Okay.  What other subpoenas were issued?

15   A    A subpoena was issued to Marcus Esquivel, as well, on

16   October 27th.  However, prior to that, the investigation

17   conducted two interviews of former Stern employees.  One was

18   Elizabeth Questa (phonetic) and one was Mary Hammers.  One was

19   late September; one was the first week of October.

20        Shortly after that, Mr. Stern contacted Mr. Esquivel,

21   asked Mr. Esquivel to meet him outside the Stern Law Firm,

22   which Mr. Esquivel did.

23        Mr. Stern indicated to Esquivel that the Government had

24   recently interviewed two of his girls, his former employees,

25   and that the Government was asking questions about runners and

1    specifically Marcus Esquivel.  He wanted to know if Esquivel

2    had spoken to the Government, which Esquivel had not at that

3    point, and he asked Esquivel to destroy the ledgers and

4    records of business transactions between Mr. Stern and

5    Mr. Esquivel.

6    Q    Did Mr. Stern and Mr. Esquivel have any legitimate

7    business interactions?

8    A    They did.

9    Q    Okay.  What were most of their records from?

10   A    Most of their business interactions were case running

11   interactions.

12   Q    And what was the legitimate interaction?

13   A    Mr. Stern represented some of Mr. Esquivel's family

14   members in some personal injury suits and I think he had

15   loaned him some money for a business venture relating to a

16   paint brush, some sort of automatic paint brush, and he had

17   also loaned Mr. Esquivel some money to purchase an Allstate

18   Insurance Agency.

19   Q    And are those transactions reflected in Mr. Esquivel's

20   ledgers along with the illegal case running transactions?

21   A    The loan for the Allstate Insurance Company is the other

22   transactions -- I'm not sure about the ones for the newest

23   family members.  I think there's some limited information in

24   there.

25   Q    All right.  So, anyway, right before there was this

flurry of activity in filing false tax returns, there had been
a number of federal grand jury subpoenas issued to associates
of Mr. Stern; correct?

A    Correct.

Q    And did all of these subpoenas seek information related
to Mr. Stern's financial dealings?

A    Yes.

Q    I'm handing you now what's been marked as "Government's
Exhibits 5 and 6."  Can you tell us what those are?

A    Exhibit 5 is a grand jury subpoena that was issued to
First Quality Health Care seeking records of that entity's
business transactions with Mr. Stern and related entities.

     And Exhibit 6 is a grand jury subpoena issued to Marcus
Esquivel seeking ledgers, notebooks, invoices, bills, and
other records relating to his business dealings with Mr. Stern
and related entities.

          MR. JOHNSON:  Move to admit Exhibits 5 and 6.

          MR. BLUMROSEN:  No objection.

          THE COURT:  They're admitted.

     (Government's Exhibits 5 and 6 were received in
evidence.)

          THE COURT:  Thanks.

BY MR. JOHNSON:

Q    So at this point in 2016, has Mr. Stern essentially
created a false record in the case?

1    A    Yes.

2    Q    And what is the false record?

3    A    The tax re --

4              THE COURT:  What time did you say?  What date?

5              MR. JOHNSON:  In this time period in 2016.

6    BY MR. JOHNSON:

7    Q    And what is the false record that's being created?

8    A    Well, by November 4th, it's created a false tax return

9    issued -- or presented by Mr. Abner indicating that Mr. Abner

10   was the recipient of the funds when he, in fact, was not --

11   the funds that had been diverted by Mr. Morris.

12   Q    Let's move on to paragraphs 89, 90 and 91 in the

13   Indictment.

14        And can you tell us what these paragraphs relate to?

15   A    Yes.  In early December, 2016, shortly after Mr. Abner's

16   tax returns were filed, Mr. Stern issued a $50,000 check

17   payable to Mr. Abner -- or rather to Roy Abner, P.C.  He

18   issued another $10,000 check to Roy Abner, P.C.  Both those

19   were deposited to Mr. Abner's bank account and followed by a

20   check from Mr. Abner to the IRS in the amount of $60,000 on

21   December 5th.

22   Q    And so what did Mr. Abner say these checks from Mr. Stern

23   were for?

24   A    They were part of the agreement that Mr. Stern and

25   Mr. Morris would pay Abner's taxes.

1  Q    And did these -- did this payment by Mr. Abner with the
2  IRS, did that then create a false record?
3  A    Yes, and --
4  Q    And what does the false record indicate?
5  A    It indicates that these funds came from Mr. Abner when,
6  in fact, they came from Mr. Stern.
7  Q    Now, why else is it important for Mr. Stern to pay
8  Mr. Abner's false tax debt?
9  A    Well, to keep Mr. Abner in the fold.
10  Q    What was going on with Mr. Abner's house at this time?
11  A    Well, tax returns had been filed previously in 2014,
12  however the entire tax debt created by those returns had not
13  been paid, and so --
14  Q    And was that a false tax debt from those returns filed in
15  2014?
16  A    Yes, it was.
17  Q    Those were other false returns filed at the request of
18  Mr. Stern and Mr. Morris?
19  A    Yes.
20  Q    And they indicated payments to Abner when really the
21  payments went to Morris?
22  A    Correct.
23  Q    Okay.  So what was the result of those false tax returns
24  in 2014?
25  A    Well, they created a tax liability that was not fully

1    paid, and Mr. Abner began receiving notices from the IRS of

2    back taxes due.

3    Q    And who was opening those notices when they would arrive

4    at Mr. Abner's house?

5    A    Many times it was his wife.

6    Q    What was her reaction to receiving letters from the IRS

7    demanding payment on taxes for income that she had never

8    received?

9    A    I don't know that she knew that she had never received

10   it, but she was very unhappy that apparently her husband had

11   incurred a large tax debt.

12   Q    How much is her house worth?

13   A    I believe the Abners' home is assessed at around 170 or

14   $190,000.

15   Q    How much is Mr. Morris' house worth?

16   A    1.2 million.

17   Q    Do you think she knew she wasn't getting a million

18   dollars a year from the Stern Law Firm?

19   A    I would presume so, yes.

20   Q    All right.  Let's move on to paragraph 94.  Paragraph 94,

21   I'm sorry.

22   A    Okay.

23   Q    What does paragraph 94 describe?

24   A    A meeting that occurred amongst Mr. Morris, Mr. Stern,

25   and Mr. Abner at Mr. Stern's law firm, in which the three men

1    discussed Mr. Abner filing an Offer in Compromise with the

2    IRS.

3    Q     What's an Offer in Compromise?

4    A     That is a proposal, essentially, by a taxpayer to settle

5    their tax debt with the IRS for less than the amount owed.

6    Q     Okay.  And why were Stern, Morris, and Abner interested

7    in filing an Offer in Compromise?

8    A     Because by this time Mr. Morris had accrued a very large

9    tax liability from all the returns that had been filed, and

10   this was an opportunity to reduce the amount they would have

11   to pay the IRS, and keep Mr. Abner happy.

12   Q     So did they, the three of them, agree to file the Offer

13   in Compromise?

14   A     Yes, they did.

15   Q     And did this -- was the Offer in Compromise false?

16   A     It was false?

17   Q     How was it false?

18   A     Essentially, it indicated in the Offer in Compromise that

19   Mr. Abner adopted all the income that had been reported on the

20   previous returns when in fact it wasn't his income.

21   Q     So does that then create another false record on file

22   with the Government?

23   A     Yes.  It indicates that Mr. Abner is accepting

24   responsibility for that income and those taxes.

25   Q     Even though it wasn't really his income?

1    A    Correct.

2    Q    Let's move on to paragraphs 96 and 97.

3         What do paragraphs 96 and 97 describe?

4    A    Paragraph 96 relates to the issuance of a check by the

5    Stern Law Firm payable to Mr. Abner.  Mr. Abner deposited that

6    check to one of his bank accounts, and a few days later wrote

7    a $54,000 check to the IRS as the down payment on the Offer in

8    Compromise.

9    Q    This Offer in Compromise that was agreed to by Mr. Stern,

10   Mr. Morris, and Mr. Abner, was there a required amount that

11   was supposed to be paid as a down payment?

12   A    Yes.  The total tax liability for all the tax years

13   outstanding, with penalties and interest exceeded, I believe,

14   a million dollars at that point.  So the Offer in Compromise

15   proposed to settle that debt for $270,000 and it requires a

16   20 percent down payment to be considered.  And so the

17   20 percent of the $270,000 is the $54,000 required by the

18   Offer in Compromise.

19   Q    All right.  And is that figure set out in the Offer in

20   Compromise?

21   A    It is.

22   Q    So what happened to that $54,000 check that Mr. Abner

23   wrote?

24   A    It was never negotiated because he wrote the check on

25   June 9th, which was a Friday, but before -- and the Offer in

1    Compromise was signed that same day on June 9th.  But before

2    it was submitted to the IRS early the following week, the IRS

3    seized the funds on deposit in Mr. Abner's account, which

4    included the $60,000 check from Mr. Stern.

5    Q    Do you have a copy of the $54,000 check that Abner wrote?

6    A    Yes.

7    Q    How did you get the copy?

8    A    Via bank records and from a tax preparer that was

9    involved in the preparation of the OIC.

10   Q    And by OIC, you mean the Offer in Compromise?

11   A    Yes, I'm sorry.  Offer in compromise.

12   Q    That's fine.  Okay, so what is your understanding, then,

13   of what the $60,000 check was from Mr. Stern and Mr. Abner?

14   A    It was to make the down payment on the Offer in

15   Compromise.

16   Q    And does Mr. Abner agree with that?

17   A    Yes.

18   Q    And was that their deal?  Was that their agreement?

19   A    Yes, it was.

20   Q    Now, proceed on to paragraphs 101 through 103.  What's

21   described in these paragraphs and what does your evidence

22   show?

23   A    What's reflected here is the subsequent attempt to obtain

24   the funds, to submit the Offer in Compromise.  So on June

25   30th, 2017 -- because the Offer in Compromise still had not

1    been submitted.

2    Q    So the first attempt by Mr. Stern to pay for the Offer in

3    Compromise was when?

4    A    June 9th.  Well, he wrote the check on June 7th.

5    The Offer in Compromise was signed on June 9th but never

6    submitted because the funds got seized.

7    Q    All right.  So now we're talking about June 30th, a

8    couple of weeks later?

9    A    Correct.

10   Q    All right.  And so what happens on June 30th?

11   A    On June 30th, Mr. Stern signs a check payable to Frost

12   Bank.  That check is converted to a cashier's check payable to

13   the Internal Revenue Service regarding Roy Abner, and the

14   remitter is indicated as Jeffrey Stern.

15   Q    I'm handing you now what's been marked as "Government's

16   Exhibits 7 through 10."  And can you tell us what these

17   documents are.

18   A    Exhibit 7 is a copy of a check issued by the Stern Law

19   Firm payable to Frost Bank on June 30th, 2017 in the amount of

20   $54,000.

21   Q    $54,000 is the amount required by the Offer in

22   Compromise?

23   A    Correct.

24   Q    Who signs that Stern Law Firm check?

25   A    Jeffrey Stern.

1    Q    That's his signature?

2    A    Yes.

3    Q    What's the date of that check?

4    A    June 30th, 2017.

5    Q    Okay.  What is Government's Exhibit 8?

6    A    Government's Exhibit 8 is a copy of a deposit slip from

7    Frost Bank that shows the $54,000 cashier's check being

8    redeposited the same day, along with a $184 cashier's check

9    that had also been purchased that same day.

10   Q    Okay.  And then Government's Exhibit 9 is what?

11   A    Government's Exhibit 9 is a copy of a $184 cashier's

12   check purchased at Frost Bank paid to the order of Internal

13   Revenue Service RE, regarding, Roy L. Abner, and the remitter

14   is Jeffrey M. Stern.

15   Q    And then Government's Exhibit 10, what is that?

16   A    Government's Exhibit 10 is a $54,000 cashier's check

17   purchased at Frost Bank on June 30th, 2017.  It's payable to

18   the Internal Revenue Service regarding Roy L. Abner, and the

19   remitter is Jeffrey M. Stern.

20          MR. JOHNSON:  Your Honor, move to admit Government's

21   Exhibits 7 through 10.

22          MR. BLUMROSEN:  No objection.

23          THE COURT:  They're admitted.

24      (Government's Exhibits 7 through 10 were received in

25   evidence.)

1  BY MR. JOHNSON:

2  Q    If you look at Government's Exhibit 9, we know what that

3  $54,000 payment is for, but what is the 184,000 -- $184

4  payment for?

5  A    That's their processing fee related to the Offer in

6  Compromise.

7  Q    And is that approximately what the processing fee is for

8  an Offer in Compromise?

9  A    Yes.  I think technically it should have been $186, but

10  it very closely approximates the fee.

11  Q    And these two cashier's checks, is there any question

12  from the face of the checks that Mr. Stern is paying for an

13  Offer in Compromise on behalf of Roy Abner?

14  A    Well, there's no question that Mr. Stern is making a

15  payment to the IRS on behalf of Mr. Abner.

16  Q    And $54,000 is the amount required by the Offer in

17  Compromise.

18  A    That's correct.

19  Q    And $184 is approximately the filing fee for an Offer in

20  Compromise?

21  A    That's right.

22  Q    Now, you said Government's Exhibit 8 shows that these

23  cashier's checks were then redeposited into the Stern account

24  that same day?

25  A    That's correct.

Q    And so if your goal were to create a false record that

Mr. Abner were paying for his tax debt and not Mr. Stern,

would these documents have accomplished that?

A    No, because they clearly indicate on the front of the

check that the remitter is Jeffrey Stern.

Q    So they got redeposited right back into Mr. Stern's

account and they were not sent to the IRS.

A    That's correct.

Q    All right.  Let's look at paragraphs 104 and 105.  What

does your evidence show was happening as described in these

two paragraphs?

A    Later that same day presumably, based on the sequential

number of the checks, Mr. Stern issued a $60,000 check payable

to one of his clients by the name of Lucretia Ragsdon.

Q    Did Mr. Morris talk to you about this check?

A    He did.

Q    What did he say?

A    He stated that Mr. Stern wrote the check for $60,000

payable to Lucretia Ragsdon, that Mr. Morris cashed the check

and used a portion of the funds to purchase a cashier's check

in payment of an Offer in Compromise.

Q    What is -- I just handed you Government's Exhibit 11.

What is Government's Exhibit 11?

A    Government's Exhibit 11 is check number -- a copy of

check number 69536 drawn on the account of the Jeffrey M.

Stern, Attorney at Law account, payable to Lucretia Ragsdon,

in the amount of $60,000, on June 30th, 2017.

Q    And how does this check number compare to the check

number that was used by the cashier's checks to the IRS that

were then quickly redeposited back into his account?

A    It is, I believe, five checks later in sequence.

Q    Did you speak with Lucretia Ragsdon?

A    Yes.  Yes, I did.

Q    What did she say?

A    She said that Fred Morris had contacted her and asked her

to come to the Stern Law Firm.  She went there and met with

Mr. Morris.  Mr. Morris asked her to sign this check and

explained to her that it had something to do with somebody

getting paid.

    She was not clear in her recollection or understanding of

exactly what it was for.  She just wanted to know that it

would not be coming out of her settlement proceeds.  He

assured her that it wasn't.  She signed the check and gave it

back to Mr. Morris.

Q    And was that check actually used to pay the IRS?

A    Yes.  Well, yes, indirectly.  The check was cashed by

Mr. Morris, and the cash obtained from this check was used to

purchase a cashier's check for the Offer in Compromise.

Q    Where was the check cashed?

A    Señor Check Cashing.

1   Q    And was that one of the check cashiers Mr. Morris used
2   regularly to conduct his illegal operation?
3   A    Yes, it was.
4            THE COURT:  And so what?  So Morris then paid the
5   IRS, is that what you said?
6            THE WITNESS:  Mr. Morris cashed the check, and him
7   and Mr. Abner used the cash to purchase a cashier's check for
8   $54,000 for the Offer in Compromise.
9            THE COURT:  Okay.
10  BY MR. JOHNSON:
11  Q    And what I just handed you was Government's Exhibit 12.
12  Is that the check to the IRS for the $54,000 payment?
13  A    Yes.
14           MR. JOHNSON:  Government moves to admit Exhibit 12.
15           MR. BLUMROSEN:  No objection.
16           THE COURT:  Admitted.
17       (Government's Exhibit No. 12 was received in evidence.)
18  BY MR. JOHNSON:
19  Q    So after three attempts, Mr. Stern was finally able to
20  pay the Offer in Compromise?
21  A    Yes.  You can see on this cashier's check in the upper
22  left-hand corner, it says "down payment. Offer in Compromise."
23  Q    Now, as part of this investigation, did you conduct an
24  undercover operation?
25  A    Yes.

1   Q    And tell us who was cooperating in an undercover
2   capacity.
3   A    At that point, Mr. Abner was cooperating in the
4   investigation, but Mr. Morris was not.  So Mr. Abner agreed to
5   wear -- basically wear a wire and record various meetings with
6   Mr. Morris.
7   Q    And did the IRS give Mr. Abner a prop to use in this
8   undercover operation?
9   A    Yes.  For the first meeting, we issued a fictitious
10  letter purporting to relate to the Offer in Compromise which
11  had been submitted, and demanding payment relating to that
12  Offer in Compromise.
13  Q    So describe for us -- did Mr. Morris and Abner have a
14  conversation about payment of the Offer in Compromise?
15  A    Yes, they did.
16  Q    And was that conversation recorded?
17  A    It was recorded.
18  Q    And so tell us basically what was said during that
19  conversation?
20  A    Mr. Morris was ecstatic that the Offer in Compromise was
21  still in play.  It's clear from the conversation that he and
22  Mr. Stern were involved in the filing of the Offer in
23  Compromise and that, according to Mr. Morris, he and Stern
24  would take care of Roy Abner and get the tax situation taken
25  care of.

1    Q    Did he indicate that both you and Mr. Stern would be
2    responsible for paying for the Offer in Compromise?
3    A    Yes.
4    Q    Were there subsequent conversations between Mr. Morris
5    and Mr. Abner that were recorded?
6    A    Yes.
7    Q    And was there a later conversation on November 8th that
8    involved a payment where the money had originated from
9    Mr. Stern?
10   A    Yes.
11            MR. GERGER:  Can we get the year, please?
12            MR. JOHNSON:  Yes, I'm sorry.  It's 2018.
13            THE WITNESS:  2018.
14            MR. JOHNSON:  And that's paragraph 115 in the
15   Indictment, correct?
16            THE WITNESS:  Yes.
17   BY MR. JOHNSON:
18   Q    And so before, before that date, what had transpired in
19   the undercover operation?
20   A    Well, there were a series of recorded calls and meetings
21   that generally revolved around the fact that in order for the
22   Offer in Compromise to be accepted, Mr. Abner would have to be
23   current on all his tax filings.
24        At that time, his 2017 tax return was due but not filed,
25   so there are discussions between Morris and Abner regarding

1    Morris getting that return prepared and filed, which he did.

2    Q    Did Mr. Abner have any involvement in preparing that 2017

3    return?

4    A    No.  He signed it when it was brought to him and it was

5    submitted to the IRS, but he was not involved in the

6    preparation.

7    Q    Did that 2017 return falsely report any information?

8    A    Yes.  It reported, as income to Mr. Abner, all the checks

9    that had been issued in his name but diverted by Mr. Morris,

10   as well as false expenses.

11   Q    And so then did you provide Mr. Abner with a second prop

12   to use in the undercover operation?

13   A    Yes.  We created a fictitious letter based on the filing

14   of the 2017 return, basically just demanding payment of the

15   2017 tax liability.

16   Q    And what was the amount of the payment demanded by your

17   fictitious IRS letter?

18   A    $19,188.07.

19   Q    Did Mr. Abner present that letter to Mr. Morris?

20   A    Yes, he did.

21   Q    What did Mr. Morris do?

22   A    He made a copy of the letter and then went directly to

23   Jeffrey Stern's law office.

24   Q    How do you know he went to Jeffrey Stern's office?

25   A    We followed him.

1          THE COURT:  Can I see it?  What does it say?  Is it

2     admitted?

3          MR. JOHNSON:  I'm sorry.  Move to admit Government's

4     Exhibit 13.

5          MR. BLUMROSEN:  No objection.

6          THE COURT:  All right, it's admitted.

7      (Government's Exhibit No. 13 was received in evidence.)

8          THE COURT:  Wait, what exhibit was that?

9          MR. JOHNSON:  13, Your Honor.

10          THE COURT:  Go ahead, I'm sorry.

11     BY MR. JOHNSON:

12     Q    And so how much approximately -- I know you don't have

13     the document in front of you right now.  But how much money is

14     being demanded by this fictitious IRS demand letter?

15     A    Around $19,188.

16     Q    And so this is the letter that Mr. Morris, you believe,

17     delivered to Mr. Stern?

18     A    Yes.

19     Q    Later, when Mr. Morris began cooperating, did you discuss

20     this event with Mr. Morris?

21     A    Yes.

22     Q    What did he say he did with this letter?

23     A    He said he took it to Mr. Stern.

24     Q    So what happened next?

25     A    That letter was presented on November 2nd.  On

1    November 6th, Mr. Stern wrote a check payable to Roy Abner,

2    P.C. in the amount of $30,000.

3    Q    All right.

4    A    On November 8th, Mr. Morris cashed that check at Señor

5    Check Cashing, and then gave $20,000 to Mr. Abner to pay

6    Abner's 2017 tax liability.

7    Q    I'm handing you now what's been marked as "Government's

8    Exhibit 14."  What is that document?

9    A    It is a copy of Check No. 81247 drawn on the account

10   of Jeffrey M. Stern, Attorney at Law, payable to Roy Abner,

11   P.C., on November 6, 2018 in the amount of $30,000, signed by

12   Jeffrey Stern, and it was cashed at Señor Check Cashing on

13   November 8th.

14   Q    And so describe for us the setting of the recorded

15   conversation that day that Mr. Morris gave Mr. Abner the

16   money.

17   A    Mr. --

18   Q    Where were they?

19   A    They met at a Chase Bank branch in Southwest Houston.

20   Q    And so they were meeting, you said, on the -- what was

21   it, the 8th?

22   A    November 8th; correct.

23   Q    And is that the same day that Mr. Morris cashed that

24   check at Señor Check Cashing?

25   A    Yes.

Q    So they're meeting at the bank branch.  What happens at
the bank branch?

A    Mr. Morris gives Mr. Abner $20,000.  Mr. Abner uses that
$20,000 to purchase a cashier's check payable to the IRS in
payment of his alleged 2017 tax liability.  The check was for
a little over $19,000, and Mr. Morris told Abner to keep the
change.

Q    I'm handing you now what's been marked as "Government's
Exhibit 15."  What is Government's Exhibit 15?

A    It is a copy of the cashier's check purchased by Roy
Abner with the $20,000 provided by Fred Morris on
November 8th.

Q    And was that interaction at the bank, was that captured
by the recording?

A    Yes.  It's audio and video recording.

Q    And did agents surveil that video?

A    Yes.

Q    All right.  So we've been talking about the creation of a
false record in order to obstruct justice.  Now, I'm going to
talk about destruction of evidence in order to obstruct
justice, okay?

A    Okay.

Q    All right.  So you already mentioned Marcus Esquivel?

A    Yes.

Q    And you recounted for us a conversation in which

1  Mr. Stern met with Mr. Esquivel outside of Mr. Stern's office

2  and instructed Mr. Esquivel to destroy documents; correct?

3  A    Yes.

4  Q    And what documents did Mr. Stern tell Mr. Esquivel to

5  destroy at that time?

6  A    His ledgers or records of his dealings with Stern and the

7  Stern Law Firm.

8          THE COURT:  Tell me the date of that again; I'm

9  sorry.  What was that?

10          THE WITNESS:  There were a couple meetings in

11  October of 2017 -- well, pardon me, '16, 2016.

12  BY MR. JOHNSON:

13  Q    Let's back up a little bit and go through the dates

14  because it's important.  The grand jury subpoena that

15  Bernstein & Toy was served on September 19, 2016?

16  A    Yes.

17  Q    And then Mr. Stern's attorneys corresponded with the

18  United States' Attorneys Office on the 22nd; correct?

19  A    Correct.

20  Q    September 22nd, 2016?

21  A    22nd or 23rd.

22  Q    Okay.  And then you said there were interviews conducted

23  of two people at the Stern Law Firm, or who used to work for

24  the Stern Law Firm.  And those occurred in late September and

25  early October of 2016?

1    A    Correct.

2    Q    And did Mr. Stern reference those two interviews when he

3    spoke with Mr. Esquivel?

4    A    Yes.  He mentioned that two of his girls had been

5    interviewed, and that the Government was asking about runners

6    and, specifically, one of whom included, I should say, Marcus

7    Esquivel.

8    Q    So therefore you know that Mr. Stern gave this order to

9    destroy documents to Mr. Esquivel after the time he knew that

10   there was a federal grand jury investigation going on?

11   A    Yes.

12   Q    And after the time his attorneys had corresponded with

13   the United States Attorney;s Office?

14   A    Yes.

15   Q    Now, were you able to serve Mr. Esquivel with a grand

16   jury subpoena also?

17   A    Yes, on October 27th.

18   Q    All right.  And according to Mr. Esquivel, what did he do

19   after he received that grand jury subpoena on October 27,

20   2016?

21   A    He called Mr. Stern, told him he'd received the subpoena,

22   and described the records the subpoena was seeking.

23   Q    What did Mr. Stern tell him to do?

24   A    He asked him to destroy any records he had related to

25   their business dealings.

Q    And those business dealings included the illegal referral and kickbacks for cases; correct?

A    Yes.

Q    Was that interaction between Mr. Esquivel and Mr. Stern, was that by telephone or was that an in-person meeting?

A    Those were in-person meetings.  Well, there was some meetings.  I believe the notification of receipt and subpoena was via telephone.

Q    And so did Mr. Esquivel destroy anything?

A    He did.

Q    Okay.  Tell us how he destroyed the documents and what he destroyed?

A    He destroyed a computer containing electronic records, as well as paper records, and he destroyed both sets of records by burning them in his chiminea at his home.

Q    What documents does he say were on that computer that he destroyed at Mr. Stern's direction?

A    His notations are records of his business dealings selling cases to Mr. Stern and other attorneys, invoices that he would generate to cover those illegal kickbacks, as well as potentially emails between himself and other -- and some of the attorneys.

Q    Do you have those emails now in your possession?

A    No, I do not.

Q    Would those emails have been useful in your

1    investigation, do you believe?

2    A    Yes, they would.

3    Q    And you said Mr. Stern [sic] also destroyed paper copies

4    of records?

5    A    Mr. Esquivel did.

6    Q    I'm sorry, Mr. Esquivel.

7    A    Yes.

8    Q    But at some point, did Mr. Esquivel make a copy of some

9    of these documents?

10   A    He did, but the paper documents, he took to a -- some

11   sort of copy service, Kinkos or FedEx, and had them scanned to

12   a USB drive.  And he sent the USB drive to his father, who

13   lives in Las Vegas, for safekeeping, and then burned the hard

14   copies.

15   Q    Now, why would he keep a copy after being instructed to

16   destroy the documents?

17   A    He said that he needed to keep track of what Mr. Stern

18   had advanced him and basically who owed how much to whom

19   regarding their cases.

20   Q    And regarding the case running?

21   A    Correct.

22   Q    At this point in your investigation, obviously

23   Mr. Esquivel was not cooperating?

24   A    He was not.

25   Q    Would you have known to execute a search warrant in

1    Las Vegas, Nevada, looking for these documents?

2    A    No.

3    Q    Did you have any indication that there were Esquivel

4    kickback ledgers in Las Vegas, Nevada?

5    A    I did not, until he told me.

6    Q    All right.

7              THE COURT:  Can you just pin it down for me, what is

8    the date that you think he did this burning in the chiminea?

9              THE WITNESS:  It would have been shortly after

10   the service of the subpoena in October of 2016.

11   BY MR. JOHNSON:

12   Q    The subpoena was served on Mr. Esquivel -- the grand jury

13   subpoena was served on Mr. Esquivel on October 27, 2016;

14   correct?

15   A    Correct.

16   Q    And then the phone call with Mr. Stern was immediately

17   after receiving the subpoena?

18   A    Correct.

19   Q    And that's when he told Mr. Stern, "All the records

20   they're asking for have to do with you," right?

21   A    Right.

22   Q    Now, was there another conversation after the documents

23   were destroyed between Mr. Esquivel and Mr. Stern?

24   A    Yes.

25   Q    And what happened in that conversation?

1    A   Mr. Stern and Mr. Esquivel met in person.  Mr. Esquivel

2    confirmed to Mr. Stern that Esquivel had destroyed the

3    records.  He said Mr. Stern was very happy.  And Mr. Stern

4    indicated that he, meaning Mr. Stern, would take care of

5    Esquivel's family if Esquivel went down.

6    Q   "Went down" were the words that Mr. Stern used?

7    A   Words to that effect.  That's the way it was relayed to

8    me.

9    Q   And what did Mr. Esquivel understand that to mean?

10    A   That Mr. Stern would give his family money if

11    Mr. Esquivel went to prison.

12    Q   Now, is Mr. Esquivel charged as part of this

13    investigation?

14    A   Yes.

15    Q   When was he charged, approximately?

16    A   Around April of 2017?

17    Q   What was he charged with?

18    A   He was charged with four counts of filing false tax

19    returns.

20    Q   How was Mr. Esquivel's case resolved?

21    A   He eventually pleaded guilty to all four counts in the

22    Indictment without a plea agreement.

23    Q   Did we ask his lawyer if Mr. Esquivel wanted to

24    cooperate?

25    A   Yes.

1    Q    And what was his response?

2    A    He did not want to cooperate?

3    Q    And he actually pled to all the counts?

4    A    He pled straight up to the Indictment.

5    Q    Now, at some point, did Mr. Esquivel decide to cooperate?

6    A    Yes, later he did.

7    Q    And what caused him to change his mind?

8    A    Concern for his family and himself.

9              THE COURT:  Was that after he was sentenced?

10             THE WITNESS:  He's not been sentenced yet.

11             THE COURT:  He's not been sentenced, okay.

12   BY MR. JOHNSON:

13   Q    Is that case also pending before Judge Rosenthal?  You

14   may not know that.

15   A    I'm not sure.

16   Q    Okay.  Now, was there another time that you learned of

17   that Mr. Stern ordered Mr. Esquivel to destroy documents?

18   A    Yes.

19   Q    When was that?

20   A    Around 2010, there was a Harris County District

21   Attorney's investigation that involved Mr. Stern.  And at that

22   time, Mr. Stern asked Mr. Esquivel to destroy any records of

23   the dealings between the two, and Mr. Esquivel did so.

24   Q    And so what records did Mr. Esquivel destroy?

25   A    Records relating to cases that he had referred to

1    Mr. Stern -- sold to Mr. Stern.

2    Q    During what time period?

3    A    Prior to 2010.  For many years, according to what he told

4    us.

5    Q    For many years?

6    A    Yes.

7    Q    And that destruction happened long before Mr. Stern knew

8    that there was a grand jury investigation; correct?

9    A    Long before this federal grand jury investigation; yes.

10   Q    But it happened in response to a law enforcement

11   investigation.

12   A    Yes, it did.

13           THE COURT:  And what were they investigating again?

14   I'm sorry, tell me -- why don't you just --

15   BY MR. JOHNSON:

16   Q    What were they investigating?

17   A    Solicitation of capital murder.

18   Q    And who was being investigated for that?

19   A    Jeffrey Stern and Michelle Geyser (phonetic), among

20   others.

21           THE COURT:  What kind of documents did he destroy?

22           THE WITNESS:  His ledgers or documentation of the

23   cases that he sold to Mr. Stern.

24   BY MR. JOHNSON:

25   Q    Was the Harris County District Attorneys Office in

1   possession of checks indicating -- of these checks to

2   Moncriffe, Broussard and Abner that were not actually received

3   by Moncriffe, Broussard, and Abner?

4   A    Yes.

5   Q    Now, did your investigation reveal any obstructive

6   behavior with respect to Mr. Morris -- between Mr. Stern and

7   Mr. Morris?

8   A    Yes.

9   Q    Okay.  When did -- approximately when did Morris' wife

10  receive that grand jury subpoena that named First Quality, her

11  health care company?

12  A    I believe it was September 27th of 2016.

13  Q    What did Morris do in response to that subpoena?

14  A    He told Mr. Stern that a subpoena had been issued to

15  First Quality and that the records sought related to that

16  entity's dealings with the Stern Law Firm.

17  Q    What did Mr. Stern tell Mr. Morris?

18  A    He asked Mr. Morris to destroy records that Mr. Morris

19  had of Morris' dealings with the Stern Law Firm.

20  Q    What kind of records did Mr. Morris have that related to

21  his dealings with the Stern Law Firm?

22  A    He had copies of a ledger or listing document written in

23  Mr. Stern's hand of the cases that Mr. Morris had sold to the

24  Stern Law Firm that indicated the clients, the case numbers

25  and the -- in some cases the advance payment that had been

1       made on the case.

2               THE COURT:  I need to know who's telling you this.

3       How do you know this?

4               THE WITNESS:  Mr. Morris is telling us this.

5               THE COURT:  In an interview?

6               THE WITNESS:  Yes, sir.  Yes, Your Honor.

7               THE COURT:  Okay, go ahead.

8               THE WITNESS:  Yes, Your Honor.

9       BY MR. JOHNSON:

10      Q    What other documents did Mr. Morris have in his

11      possession that related to his kickback scheme with Mr. Stern?

12      A    He also had documents very similar to one of the first

13      exhibits we looked at, where he would submit a list of cases

14      to the firm that he needed to get paid for.

15      Q    That's Government's Exhibit 1?

16      A    Yes.

17      Q    Essentially Morris' handwritten invoice to the Stern Law

18      Firm?

19      A    Correct.

20      Q    For a kickback check?

21      A    Correct.

22      Q    And Mr. Morris had a number of those types of documents

23      in his possession?

24      A    Yes.

25      Q    Did Morris destroy any of these documents upon

1    Mr. Stern's order?

2    A    He did not.

3    Q    Now, later, did he and Stern destroy any of the documents

4    together?

5    A    Yes.  At some point, as Mr. Morris would bring in the

6    invoices, the documents similar to Exhibit 1, either

7    Mr. Morris or Mr. Stern would shred them, you know,

8    immediately after they were done using them.

9              THE COURT:  In what time frame?

10             THE WITNESS:  Beginning I believe -- it definitely

11   would have been after these were submitted to Rosemary

12   Wilsusen, so probably 2017, Your Honor.

13             THE COURT:  Okay.

14             MR. JOHNSON:  And so this is --

15             THE WITNESS:  Or maybe later.

16   BY MR. JOHNSON:

17   Q    At any rate, this is long after the grand jury subpoena

18   was served on First Quality?

19   A    Yes.

20   Q    And that Mr. Morris reported that grand jury subpoena to

21   Mr. Stern?

22   A    Yes.

23   Q    And that they discussed that it was asking for records

24   relating to Mr. Stern?

25   A    Correct.

1    Q    Did Mr. Morris destroy the handwritten ledgers?

2    A    Either Mr. Morris or Mr. Stern did.

3    Q    Well --

4    A    Or pardon me, not the ledgers.  Just the invoices as they

5    used then.

6    Q    But what about the actual Stern ledgers, the kickback

7    ledgers?

8    A    No, they did not.

9    Q    What did Mr. Morris do with those ledgers?

10   A    He provided them to the Government.

11   Q    And are they in your possession?

12   A    They are.

13   Q    Those are written in Mr. Stern's hand, his own writing,

14   according to Mr. Morris?

15   A    According to Mr. Morris, yes.

16   Q    Would those additional check requests or invoices --

17   I guess Morris invoices, that were destroyed, would those have

18   been useful to your investigation?

19   A    Yes.

20   Q    Were there any meetings between Mr. Stern and Mr. Morris

21   where Mr. Stern aggressively interrogated Mr. Morris?

22   A    Yes.

23   Q    Okay.  Why don't you describe those meetings to us?

24   A    There were a couple of meetings.  One, around January of

25   2019, Mr. Morris was summoned to Mr. Stern's law firm.

1    Mr. Stern took Mr. Morris' phone away from him, took it to

2    another room, then came back.  Wanted to know, in the words of

3    Mr. Morris, "What the hell have you done?"  Wanted to know who

4    Mr. Morris had been talking to.  Mr. Morris denied talking to

5    the Government.

6        Mr. Stern wanted to know if Mr. Morris' attorney had

7    asked him to sign anything.  He pointed out that other

8    people's attorneys all worked in the same building and they

9    had been communicating, but Mr. Morris' attorney was not

10   communicating with anyone.

11       He asked him several times if Morris was talking to

12   anybody.  Mr. Stern said that he would do whatever it took to

13   protect himself.

14   Q    Did he explain what he meant by, "I'll do whatever it

15   takes to protect myself?"

16   A    No.

17   Q    And then what else did he say?

18   A    That was pretty much it.  He was wanting to know if

19   Mr. Morris was cooperating.  Mr. Morris repeatedly denied it.

20   And according to Mr. Morris, eventually by the end of the

21   meeting, Mr. Stern was satisfied and --

22   Q    I may have spoken earlier --

23   A    -- that was the end of it.

24   Q    I may have spoken earlier, but did Mr. Stern say that

25   -- or claim that he had, quote, "someone inside?"

1    A    Yes, he did say that.

2    Q    What did Mr. Morris understand that to mean?

3    A    Well, he wasn't sure.  He thought it was basically a ruse

4    to try and trick him into admitting that he was cooperating or

5    not cooperating.

6    Q    At that point, was Morris actually cooperating?

7    A    Yes.

8              THE COURT:  And that was in January of 2019?

9              MR. JOHNSON:  Was that January 29, 2019?

10             THE WITNESS:  Yes.

11   BY MR. JOHNSON:

12   Q    How did Morris understand the phrase that Mr. Stern would

13   do whatever it takes to protect himself?

14   A    Exactly that, I assume.  I know that Mr. Morris has

15   expressed fear for his safety and his family's safety.

16   Q    His physical safety?

17   A    Yes.

18   Q    Was that expressed --

19             THE COURT:  Based on what?  I'm sorry, wait, wait.

20   Are you going to get there?  Based on what?

21             THE WITNESS:  Based on knowing Mr. Stern and his

22   relationship with Mr. Stern.

23   BY MR. JOHNSON:

24   Q    How long has he known Mr. Stern?

25   A    He's been selling cases to Mr. Stern for, I think, around

1    20 years, maybe more.

2    Q    Have they, over the years, had a close working

3    relationship?

4    A    Yes.

5    Q    Was he in regular contact with Mr. Stern?

6    A    Yes.

7    Q    Did other people at the Stern Law Firm see Mr. Morris

8    over at the Stern Law Firm all the time?

9    A    Yes.  Specifically more so in the past obviously, but,

10   yes, he's frequently there.

11   Q    When Morris pled guilty, was it expressed to the judge,

12   Christina Bryan, who took the guilty plea, that he was in fear

13   for his personal safety?

14   A    I don't remember --

15   Q    You don't remember?

16   A    -- if it was expressed at that point.  I know it was

17   expressed to me during my discussions with Mr. Morris.

18   Q    If it was expressed to the judge, presumably it would be

19   on the tape of the plea colloquy; correct?

20   A    Yes.

21        THE COURT:  Well, look, if it's on a tape, does

22   anybody -- what did he say?  Does anybody mind him just

23   telling us what was said?

24        MR. BLUMROSEN:  No, Your Honor.

25        MR. JOHNSON:  I know what was said.

1          THE COURT:  Can you just tell us what was said?

2          MR. JOHNSON:  Letitia Quinones, who was Mr. Morris'

3     counsel, told Christina Bryan that she had serious concerns

4     for her client's physical safety.

5          THE COURT:  All right.  And that was all she said?

6          MR. JOHNSON:  Yes.

7          THE COURT:  Thank you.

8          MR. BLUMROSEN:  Just to clarify, Your Honor, we're

9     talking about a tape of Mr. Stern saying something; correct?

10         THE COURT:  We're talking about his lawyer having

11    said what he just said.

12         MR. BLUMROSEN:  Thank you.

13         THE COURT:  All right.

14    BY MR. JOHNSON:

15    Q    Was there another meeting between Mr. Stern and

16    Mr. Morris in approximately July of 2019?

17    A    Yes.

18    Q    In which, in that meeting, did Mr. Stern -- did that

19    meeting occur shortly after the grand jury testimony of

20    Rosemary Wilsusen?

21    A    Yes.

22    Q    Okay.

23    A    I don't remember the exact date of that meeting.

24    I remember a meeting with Mr. Stern and Mr. Morris.  After

25    Ms. Wilsusen had testified, Mr. Stern expressed frustration

1     that the Government was apparently in possession of text

2     messages and photos sent from Mr. Morris' phone to

3     Ms. Wilsusen's phone, including Exhibit 1.

4          He wanted to know if Mr. Morris' phone was tapped.

5     Mr. Morris said that it was not.

6     Q    Had they engaged in a -- did they have an arrangement

7     -- did Morris and Stern have an arrangement in order to

8     prevent wiretaps of their phones?

9     A    Yes.

10    Q    What was that?

11    A    Mr. Stern had instructed Mr. Morris to buy cricket phones

12    or commonly referred to as "burner phones" and to obtain new

13    ones frequently.  Every month or two, they would switch

14    phones.

15    Q    And this is something that Mr. Stern told Mr. Morris to

16    do?

17    A    Yes.

18    Q    Were these instructions given to Mr. Morris after

19    Mr. Stern knew about the federal grand jury investigation?

20    A    Yes.

21              THE COURT:  So what was the context of this July

22    2019 meeting?  There was this grand jury testimony, and then

23    Stern and Morris meet.  I mean, what was the context of that?

24    Where?  When?  Why?

25              THE WITNESS:  I think the context was to try and

1    determine how the Government was able to obtain the text

2    messages from --

3            THE COURT:  When I say "context," I mean like where

4    was it, why did it happen?  Did somebody call somebody?  Did

5    they run into each other at Walmart?  How did it happen?

6            THE WITNESS:  It was at Mr. Stern's office.  I don't

7    recall if Mr. Morris had been summoned or if he was just there

8    on business.

9            THE COURT:  Okay.

10   BY MR. JOHNSON:

11   Q    And what was the normal routine when Mr. Stern would

12   summon Mr. Morris to his office to discuss the investigation?

13   A    Normally, he would take his phone -- and that's

14   corroborated by Mr. Abner.  He also had some meetings at

15   the Stern law office, before he began cooperating, in the

16   company of Mr. Morris.  And Mr. Abner stated that Mr. Stern

17   would take their phones and he would put them in another room

18   or lock them in a cabinet before having any conversations.

19   Q    Why did they understand that was being done?

20   A    Presumably so that the conversation couldn't be recorded.

21   Q    Is that what Mr. Morris and Mr. Abner understood?

22   A    Yes.  That's my understanding.

23   Q    Was there further discussion during this July 2019

24   meeting about an assignment from Mr. Morris?

25   A    Yes.

1    Q    And what was that?

2    A    Mr. Stern asked him to come up with some "shit," was the

3    word that Mr. Morris used, on Roy Abner.  In case Abner rolled

4    on them or decided to cooperate, Mr. Stern wanted to have some

5    dirt ready that they could use against Mr. Abner.

6    Q    From your review of Mr. Stern's tax returns during the

7    time period of this investigation, what approximately does

8    Mr. Stern make per year?  And I understand that the tax

9    returns are apparently grossly understating his income, but

10   even the understated income value, what is it?

11   A    Between a little over 900,000 and 3.7 million a year.

12   Usually around 3 million a year.

13   Q    And from a review of Mr. Stern's tax returns, is there an

14   indication whether or not he has foreign bank accounts?

15   A    He does have foreign bank accounts.

16            THE COURT:  One second, please.

17       (Brief pause.)

18            THE COURT:  I'm sorry, go ahead, please.  I need a

19   minute, so let's take about a five-minute break, and we're

20   also going to just try to figure out what's happening in this

21   next case so I can be efficient with other lawyers, if

22   possible.  I'm not going to stop you; I just want to see if we

23   can figure out what's happening.  Five minutes; we'll be back.

24            COURT CLERK:  All rise.

25       (Recess taken from 3:04 p.m. to 3:15 p.m.)

AFTER RECESS

THE COURT:  Thank you for your indulgence.  So the other hearing -- how long do you think -- and I'm not rushing anybody, I just want to how long we think -- when do you think we'll be done with evidence?

MR. BLUMROSEN:  I don't anticipate my cross will be much longer than 30 minutes, Your Honor.

THE COURT:  So if I tell the other lawyers to come back at 4:00, do we have some level of confidence that I won't be wasting their time?

MR. JOHNSON:  I have no other witnesses.

MR. GERGER:  We will have a very short proffer after that.

THE COURT:  Yeah, I mean that's fine.  You don't have to, you know, beat me over the head.  I get it.

So the lawyers on the case that's set for 3:00, I'm so sorry, we're just taking a while.  So come back at 4:00.

UNIDENTIFIED SPEAKER:  All right, Judge.  Thank you.

THE COURT:  All right.  Okay.  Thanks.

All right.  Where were we?  Did you pass the witness?

MR. JOHNSON:  Yes, Your Honor.

THE COURT:  We don't have our witness.  Well, he'll be right back.

By the way, can we talk about that *Jencks* Act matter

1    before it comes up?

2            MR. JOHNSON:  Yes, Your Honor.

3            THE COURT:  My reading of the rule and the cases is

4    that his reports need to be made available for use at the

5    hearing.  You now have them, are you going to be asking for a

6    continuance to consider those reports?

7            MR. GERGER:  We're not, Your Honor -- we're not,

8    Your Honor, but I do want to point out they're over 200 pages

9    long.  So I'm --

10           THE COURT:  I'm asking you if you want a

11   continuance.

12           MR. GERGER:  No.

13           THE COURT:  That is the procedure, and you're

14   welcome to it.  We can -- if you need to read those -- I'm not

15   going to make them copy them for you, I don't think that's

16   required.  But if what you want to do is have a continuance so

17   you can read those reports so that you can properly cross-

18   examine the witness, you're welcome to do that.

19           MR. GERGER:  Yeah.

20           THE COURT:  I welcome you to do that.  That's what

21   I'm supposed to do.

22           MR. GERGER:  We've made a decision at this point to

23   go forward.

24           THE COURT:  Okay.  Well, for the Record.  Okay.  The

25   witness has been passed.  Cross?

1          MR. BLUMROSEN:  May I proceed, Your Honor?

2          THE COURT:  Go ahead.

3            CROSS-EXAMINATION OF ROBERT SIMPSON

4  BY MR. BLUMROSEN:

5  Q    I guess -- my name is Dean Blumrosen.  We've met before.

6  Correct?

7  A    Yes.

8  Q    I want to start at the end of your testimony, and since

9  we're in the context of a detention hearing, was it your

10  intent to leave the impression with the Judge that Mr. Stern

11  had threatened Fred Morris?

12  A    Mr. Stern hasn't made any direct threats against

13  Mr. Morris that I'm aware of.

14          THE COURT:  That's not the question.  Was that your

15  intention to leave that impression with me?

16          THE WITNESS:  My intention was to relay that

17  Mr. Morris had feared for his safety.

18          THE COURT:  Okay.

19          THE WITNESS:  Which is what the situation is.

20  BY MR. BLUMROSEN:

21  Q    And in doing that was it your intent to leave the

22  impression with His Honor that at some point during that

23  meeting, the July 2019 meeting, that Mr. Stern had threatened

24  Mr. Morris?

25  A    No.

1     Q    Okay.  When did Mr. Morris start cooperating?

2     A    It would have been after November 8, 2018 when the

3    payment was made.  It was probably December of 2018.

4     Q    And so you had an undercover operation that you talked

5    about, you had people wearing wires.  Correct?

6     A    One person wearing wires.

7     Q    Mr. Abner.  Correct?

8     A    Correct.

9     Q    Is there any reason why you didn't send Mr. Morris to

10   meet with Mr. Stern wearing a wire?

11    A    Yes.

12    Q    Why is that?

13    A    Mr. Esquivel and Mr. Morris had indicated to us that

14   Mr. Stern had the capabilities in his office to detect

15   transmitting devices.  Also, we'd already interviewed

16   Mr. Abner and Mr. Morris about their phones being removed.  It

17   was just not a situation that we would send a witness into,

18   plus Mr. Morris had indicated he wasn't willing to do it out

19   of fear.

20    Q    Do you have -- in your entire investigation do you have

21   any tape recordings of Jeffrey Stern?

22    A    No.

23    Q    All the recordings that you have are of Mr. Abner

24   speaking to Mr. Morris?

25    A    Yes.

1    Q    The same thing with Mr. Esquivel when he started

2    cooperating, do you know when that was?

3    A    That would have been late 2017, I think.

4    Q    Okay.  Now any -- you detailed in the Indictment many

5    different instances of what you're alleging is obstruction and

6    witness tampering.  Correct?

7    A    Yes.

8    Q    You've read the Indictment.  Correct?

9    A    Yes, I have.

10   Q    There's not one syllable in there about Mr. Stern

11   threatening anybody, is there?

12   A    Not that I'm aware of.

13   Q    And as a matter of fact, and again, we're doing this --

14   the Judge has offered us the opportunity, but we wanted to go

15   forward today, you did note in your report about the meeting

16   between Mr. Stern and Mr. Morris in July and in January of

17   2019, that no threats were made to Mr. Morris.  Correct?  You

18   noted it in your report, did you not?

19   A    I don't remember if I noted that, but that's my

20   understanding of what happened.

21           MR. BLUMROSEN:  May I approach, Your Honor?

22           THE COURT:  Sure.

23   BY MR. BLUMROSEN:

24   Q    Again, we're doing this -- looking at one instance, how

25   many pages of reports have you filed in this matter -- have

1   you conducted in this matter -- how many reports have you

2   written?

3   A    I have no idea.  A lot.

4         THE COURT:  It looks like a couple hundred pages.

5   Is that all your reports right there, sir?  Are those your

6   reports?

7         THE WITNESS:  Yes, that's all the reports that have

8   been written.

9         THE COURT:  All right.  It's two inches thick.

10        Go ahead.

11  BY MR. BLUMROSEN:

12  Q    This is a February 1, 2019 memorandum.  Is this a report

13  that you wrote?

14  A    I don't know, the signature page isn't on the back, but I

15  have no reason to doubt that it is.

16  Q    I'll submit to you that it was given to us by Mr. Johnson

17  today, and that's what we've got, so I assume that Mr. Johnson

18  wouldn't give us a report that you didn't write that has your

19  name on it.  Correct?

20  A    He would not.

21  Q    Okay.  So can we stipulate that this is your report?

22  A    Yes.

23  Q    Okay.  You also state in there after a while -- this is

24  about a meeting with Mr. Morris, "Stern did not directly

25  threaten Morris but Mr. Morris was uncomfortable and worried.

1    But when Mr. Morris left the office, Stern seemed satisfied

2    that Morris had not spoken to the Government."

3          Did I read that accurately?

4    A    Yes.

5    Q    So are you aware of any place -- since it's not in the

6    Indictment, are you aware of any place in any report that you

7    may have written where you believe that Mr. Stern threatened

8    Mr. Morris or any witness in this matter?

9    A    No.

10          MR. BLUMROSEN:  Your Honor, I'm going to mark this

11   and offer this as Exhibit 1.

12          THE COURT:  Any objection?

13          MR. JOHNSON:  No objection.

14          THE COURT:  It's admitted.

15     (Defendant Exhibit No. 1 marked for identification and

16   received into evidence.)

17          MR. BLUMROSEN:  May I approach, Your Honor?

18          THE COURT:  Yes, sir.

19   BY MR. BLUMROSEN:

20   Q    Is this another copy of a memorandum interview conducted

21   by you and report written by you regarding this matter?

22   A    Yes.

23   Q    It's dated July 19, 2019.  Correct?

24   A    Correct.

25   Q    And in this you, among other things, you talk about Fred

1    Morris's meetings with Mr. Stern in January of 2019.  Do you

2    recall that?

3    A    Not off the top of my head, but if it's in there, I'm

4    sure it's accurate.

5    Q    Could you read paragraph 8, just the line that I've

6    highlighted, to the Court, please?

7    A    "During a January 2019 meeting at Stern's office, Stern

8    did not directly threaten Morris, nor did he offer him

9    anything not to cooperate with the Government."

10   Q    So as we sit here right now at this detention hearing, do

11   you have any evidence that you can tell the Court about that

12   Mr. Stern threatened Mr. Morris or anybody in this case?

13   A    Not directly, no.

14             THE COURT:  Okay.  Sir, here.

15             MR. BLUMROSEN:  Thank you, Your Honor.

16             THE COURT:  Yeah.

17             MR. BLUMROSEN:  I'll mark this as Exhibit 2 and ask

18   that it be admitted.

19             THE COURT:  Objection?

20             MR. JOHNSON:  No objection, Your Honor.

21             THE COURT:  All right.  It's admitted.

22        (Defendant Exhibit No. 2 marked for identification and

23   received into evidence.)

24   BY MR. BLUMROSEN:

25   Q    Do you maintain a draft of your rough notes for all the

1    reports that we've -- that you've written that was shown in

2    the binder that the Judge reference is a couple of inches

3    thick, do you maintain those rough notes?

4    A    I should have notes, yes, for all those interviews.

5    Q    Okay.  You would agree with me, would you not, Agent

6    Simpson, that Mr. Stern is not a serious flight risk if he was

7    a granted a bond.  Correct?

8    A    I would not agree with that.

9    Q    Okay.  Do you know how many times Mr. Stern has been out

10   of the country since Mr. Johnson and you have indicated he's

11   known about this investigation?

12   A    I do not -- at least once that I know of.

13   Q    Yeah.  You were not made aware of the six different times

14   he's been out of the country since this investigation has been

15   ongoing?

16   A    I was not.

17   Q    Have you seen a copy of his passport?

18   A    I have seen a copy of his passport.

19   Q    Did you look at the stamps on it?

20   A    Actually, you know what, I take that back, I'm thinking

21   of the tax report that indicates his travel, I've seen that.

22   Q    He's on a watch list, I mean you'd know if he's leaving.

23   Correct?

24   A    If he's on a watch list, I wasn't aware of it.

25   Q    Okay.  Well, as a matter of fact you arrested him at the

1    airport last -- was it last Saturday?

2    A    Yes.

3    Q    On his way back from out of the country.  Correct?

4    A    That's correct.

5    Q    And you were aware of the fact that he was coming back on

6    that flight because of information that we provided to you.

7    Correct?

8    A    That's correct.

9    Q    As a matter of fact, that's contained in Exhibit 5 of the

10   motion for bond that we filed with the Court, so Mr. Gerger

11   sent emails to Mr. Johnson making sure he was aware that you

12   all knew Mr. Stern and his family, his wife and his son, were

13   traveling overseas.  Correct?

14             THE COURT:  Wait.  Pause.

15             All I got was something delivered to chambers

16   moments before.  I don't have exhibits.  So if there's

17   exhibits I'm supposed to have, I don't have them.  Does the

18   Government have them?

19             MR. JOHNSON:  I'll check, Your Honor.

20             THE COURT:  I mean, did you receive this motion that

21   they're referring to?

22             MR. JOHNSON:  Just when I walked --

23             THE COURT:  Okay.

24             MR. JOHNSON:   -- in here today.

25             THE COURT:  Yeah, I -- so --

1        MR. GERGER:  I've handed up to the Court some

2    exhibits, Your Honor.

3        THE COURT:  Thanks.

4        So hold on, since I'm supposed to already know about

5    this, let me look at this.  Just -- can we just take a

6    one-minute break?

7        MR. JOHNSON:  Yes.

8        MR. BLUMROSEN:  Yes, Your Honor.

9      (Pause in the proceedings.)

10       THE COURT:  So this Exhibit 2, this has all been

11   pretty much baked into the Pretrial Services Report.  Right?

12       MR. GERGER:  It has, and I think Mr. Blumrosen just

13   dealing with Exhibit 5 --

14       THE COURT:  All right.  I just want to make sure

15   that -- I mean if you're thinking that I have something that I

16   don't have, then --

17      (Pause in the proceedings.)

18       THE COURT:  All right.  So Exhibit 5 is a series of

19   emails between the lawyers advising about this travel.  Right?

20   Is that essentially what this is?

21       MR. BLUMROSEN:  It is, Your Honor.

22       THE COURT:  All right.  Go ahead.

23   BY MR. BLUMROSEN:

24   Q    And were made aware of those emails?

25   A    I wasn't made aware of any specific email, I was made

aware that Mr. Stern was traveling and when he'd be returning.

Q    Well, did Mr. Johnson provide you with the flight number, the hotel, the entire itinerary which we provided to him?

A    Yes.

Q    And so you got the flight number and you knew what flight he was coming back to the country on.  Correct?

A    Yes.

Q    And when you arrested him it was without incident. Correct?

A    Correct.

Q    He didn't put up a fight, didn't try and run, didn't do anything.  Correct?

A    He did not.

Q    You said that you've seen Mr. Stern's tax returns for -- how many years would you say you've seen them for?

A    At least eight or nine years, maybe ten.

Q    I heard the years that you said that you thought there were fraudulent entries.  You didn't mention 2016 or '17.  Do you see any false entries in those records?

A    I believe there are false entries on those -- on those tax returns.

Q    Do you know how many millions of dollars Mr. Stern has paid in taxes over the period of time that you've been investigating him?

A    I don't.

1    Q    Would you be surprised to learn that it's over $15

2    million worth of federal income taxes that Mr. Stern has paid?

3    A    I would not be surprised.

4    Q    You're not trying to leave the impression that

5    Mr. Stern -- you are trying to leave the impression -- or you

6    believe that he's a tax cheat.  Correct?  That's what you

7    believe.  Correct?

8    A    Absolutely.

9    Q    But you're not trying to leave the impression that he

10   hasn't paid -- you don't dispute the figure of over $15

11   million he's paid in federal income taxes, do you?

12   A    No.

13   Q    Page 23 and 25 of the Indictment they talk about Stern

14   taking what are "illegal deductions".  Do you recall talking

15   about those illegal deductions?  Not specifically in any

16   paragraph that -- throughout the Indictment it talks about

17   illegal deductions.

18   A    Yes.

19   Q    What evidence are you relying on that Mr. Stern knew that

20   the deductions that he's taking are illegal?

21   A    Testimony of his employees --

22   Q    Specifically who?

23   A    Robert Koenig --

24   Q    All right.  Who else?

25   A     -- indicated that Mr. Stern would instruct him when to

1    write a referral fee check to those attorneys and that he

2    would return those checks to Mr. Stern.  They were to be made

3    out as referral fee checks.  Also discussions with his tax

4    preparers regarding the illegal deductions we discussed

5    related to the medical expenses for First Quality.

6    Q    Well, did one of his tax preparers tell you specifically

7    that Mr. Stern knew that he could not deduct referral fees/

8    A    No.  Not that I recall.

9    Q    Paragraphs 1 through --

10          THE COURT:  Well, when you say could not deduct

11   referral fees, you mean referral fees that were actually paid

12   to a runner.

13          THE WITNESS:  Correct.

14          THE COURT:  Okay.

15   BY MR. BLUMROSEN:

16   Q    Did you discuss that with the tax preparer?

17   A    Whether he could deduct referral fees or the payments to

18   the runners?

19   Q    Well, either one, referral --

20   A    Yeah --

21   Q     -- fees and/or referral fees that were paid to runners.

22   A     -- we did discuss referral fees and there was some

23   discussion of deducting illegal payments, but I frankly don't

24   remember the details.

25   Q    Well, in Paragraphs 151 through 53 you say that he

1   didn't -- that Mr. Stern did not include money in his tax

2   returns, but in Paragraph 31 you say that Stern was audited

3   and paid the tax.  I believe you testified about that.  Do you

4   recall that testimony, you said he paid a penalty as well?  A

5   fraud penalty I believe is what Mr. Johnson called it.

6   A    Well, he did pay a fraud penalty, but are the -- I'm not

7   sure -- what are the paragraphs you're referring to again?

8            THE COURT:  Maybe -- what's the question?

9   BY MR. BLUMROSEN:

10  Q    Well, the belief -- I'm asking are you certain that the

11  money that you're saying he didn't pay was not, in fact, paid

12  when it doesn't even admit that he actually paid the amount

13  that you say was not paid in the Indictment.  Paragraphs 151

14  through 153 of the Indictment said he did not include certain

15  money in his tax returns.  You see that?

16  A    Yes.

17  Q    Okay.  Then Paragraph 31, I believe you testified about

18  this as well, that he paid the IRS a civil penalty including,

19  I believe you called it a fraud penalty.  Do you recall that?

20  A    Correct.  But Paragraph 151 says that the income

21  deposited to his personal accounts was not reported to the IRS

22  on his tax returns.  He did pay taxes on that amount after it

23  was discovered during an audit.  And Paragraph 153 refers to

24  $188,000 in checks that were negotiated at a check casher and

25  that money was never reported because the IRS Civil Division

1    never discovered it.

2    Q    Attorney Number 1 is Roy Abner throughout the Indictment.

3    Correct?

4    A    Yes.

5    Q    How many cases, if you know, has Roy Abner referred to

6    Mr. Stern in say the last four or five years?

7    A    I don't know.  He has referred a few cases, it's a small

8    number.

9    Q    Do you know what the percentage of Stern's law firm are

10   current business referrals from Roy Abner?

11   A    I do not.

12   Q    You're not saying it's illegal for Mr. Stern to pay an

13   actual referral fee to another lawyer, are you, sir?

14   A    No, sir.

15   Q    Do you know if any of the payments to Roy Abner from the

16   Stern Law Firm, are they legitimate referral fees?

17   A    Very few are, yes, some of them are.

18   Q    How do you determine which ones are legitimate and which

19   ones are not?

20   A    Based on a variety of factors including Mr. Morris's and

21   Mr. Abner's testimony, as well as how the checks were

22   negotiated and --

23           THE COURT:  Can I just be clear?  When you say

24   testimony do you mean Grand Jury testimony or interviews with

25   you?

1          THE WITNESS:  I'm sorry, interviews --

2          THE COURT:  Okay.

3          THE WITNESS:   -- Your Honor.

4          MR. BLUMROSEN:  May I approach, Your Honor?

5          THE COURT:  Yeah.

6   BY MR. BLUMROSEN:

7   Q    I believe I heard you testify to Government's Exhibit

8   Number 1 that the names written down are legitimate clients.

9   Correct?

10  A    Yes.

11  Q    Is that what you testified to?

12  A    Yes.

13  Q    Okay.  Did you speak with those clients?

14  A    I have not spoken with these clients.

15  Q    Okay.  These are legitimate clients with the Stern Law

16  Firm, yet you refer to them when they're paying Roy Abner

17  they're called kick-backs.  Correct?  That's what you're

18  calling them.

19  A    That's what I'm calling them, but the payments were to

20  Mr. Morris.

21  Q    Well, the checks were written out to Roy Abner.  Correct?

22  A    Correct.

23  Q    Is it your testimony that Roy Abner -- all the checks

24  were written to Roy Abner, he never put any of that money in

25  his account?

1   A    No, that's not my testimony.

2   Q    Okay.  Are you saying that all checks written by the

3   Stern Law Firm to Roy Abner are kickbacks and illegal

4   payments?

5   A    No, just the overwhelming majority of them.

6   Q    And how do you determine that?  It's based on a number of

7   factors.  So do you know whether he even -- if there's

8   legitimate clients, how do you know these are kickbacks in

9   Exhibit 1?

10  A    Because they're made for the referral for a specific

11  client to Fred Morris.

12  Q    And that -- you're getting that based on what Fred's

13  telling you.  Correct?

14  A    And the fact that that came from his phone.

15  Q    Well, it's Fred sending a text to Rosemary asking for

16  payment on legitimate cases.  Correct?

17  A    On cases that he referred to the Stern Law Firm, correct.

18  Q    That's -- you're getting that from Fred, that you don't

19  know whether Roy referred them or Fred referred them.  You're

20  saying that Fred referred them.

21  A    Well, we're getting that from Fred and Roy.

22  Q    Okay.  But no tape recording of Stern acknowledging that.

23  Correct?

24  A    No, sir.

25  Q    There's not going to be one tape recording we're ever

1    going to hearing in this case of Jeff Stern.  Correct?

2    A    Not that I'm aware of.

3    Q    I know you -- the testimony sounded like Fred Morris

4    worked for Jeff Stern.  He actually is employed by Roy Abner.

5    Correct?

6    A    It depends on how you want to define employment.  He

7    doesn't receive a W-2 or anything else from either one of

8    them, but he works for both of them.

9    Q    Where is his office?

10   A    Fred Morris?

11   Q    Yes.

12   A    He maintains an office, according to several witnesses,

13   at First Quality Healthcare, which is his wife's health

14   clinic.

15   Q    Do you know how much money Roy Abner put into his bank

16   account from referral fees from the Stern Law Firm?

17   A    Into his own bank account?

18   Q    Yes.

19   A    No.

20   Q    Did you ever look into that?

21   A    Yes.

22   Q    Okay.  Do you have an idea?

23   A    It's a very small percentage of the amount that was

24   written over the time period.

25   Q    And did Mr. Abner tell you why he maintains cash instead

1    of putting a lot of money into the bank, or he's telling you

2    he didn't get the money, is that what he told you?

3    A    Correct.

4    Q    Okay.  Do you know whether Company 1, which is Morris's,

5    Fred Morris's wife's company, did Stern clients actually

6    receive medical treatment there?

7    A    Yes.

8    Q    Do you know how many of the Stern clients receive medical

9    treatment there?

10   A    I don't know a number but it's a lot of them.

11   Q    Okay.  So you admit that a lot of the payments that the

12   Stern Law Firm made to Company Number 1 were, in fact,

13   legitimate payments for medical expenses.  Correct?

14   A    At least a portion of the payment would be legitimate,

15   yes.

16   Q    Well, how do you distinguish if -- because in the

17   Indictment it just calls them all kickbacks.

18   A    Well, I don't think the Indictment is alleging that

19   payments -- are you talking about the 2011 payments?

20   Q    Yeah, but all throughout the Indictment it talks about

21   when the Stern Law Firm writes a check going to Company

22   Number 1, they're illegal kickbacks.  Correct?  That's what

23   the Indictment alleges.

24   A    Sometimes it was a kickback and other times it was in

25   payment of medical services that had been provided for a Stern

1    client.

2    Q    And how would you determine which one was a kickback and

3    which ones were legitimate medical expenses?  Did you do that

4    in this case?

5    A    Yes.

6    Q    So every payment --

7    A    Well --

8    Q     -- that's been made from the Stern Law Firm to Company

9    Number 1 you know whether or not it was a kickback or you know

10   whether or not it was for a legitimate medical expense.  Is

11   that correct?

12   A    I would say out of the universe of payments we've

13   identified some that are definitely kickbacks.  We've

14   identified some that are definitely legitimate medical

15   services, and there's another universe that we haven't

16   explored.

17   Q    And my question was, are you able to determine

18   specifically by payment which ones are legitimate and which

19   ones are ones you're calling kickback?  Every one of the

20   payments are you able to determine that, yes or no?

21   A    I don't understand what you mean by payment.

22   Q    Okay.  The Stern Law Firm wrote many, many checks to

23   Company Number 1.

24   A    Right.

25   Q    Okay.  Those were payments to Company Number 1.

1    A    Right.

2    Q    Checks.  Correct?

3    A    Correct.

4    Q    As we sit here can you tell the Court specifically do you

5    know exactly which one of those payments are for legitimate

6    medical expenses and which ones are referred to as "kickbacks"

7    in the Indictment?

8    A    I can.

9    Q    Every single payment you can do that.

10   A    Yes --

11   Q    Okay.

12   A    -- the ones that are in the Indictment.  I also told you

13   I haven't looked at every single payment.

14   Q    And so then the answer to my question is you can't do

15   that.  Correct?

16   A    I guess I'm confused by your question.

17              THE COURT:  All right.  So --

18              THE WITNESS:  You said in the Indictment --

19              THE COURT:  Wait, wait, when I say stop, you stop.

20              THE WITNESS:  Yes, Your Honor.

21              THE COURT:  For any given payment, as he's defining

22   it, to Company Number 1 how do you figure out if it is for a

23   medical expense or if it is a kickback?  He's doing -- I'm

24   just asking you an open-ended question which he is not doing.

25   Now I'm asking how do you do that?

1          THE WITNESS:  We can look at the check stubs we

2     obtained from the search warrant and if the check is in

3     payment of a client's case, it will list the client's name and

4     the case number on the check stub, and those are generally

5     also tied to records that we subpoenaed from First Quality for

6     treatments that were provided so we can tie a check to the

7     client.  The checks that are kickback checks are generally

8     larger, they're not linked to a client in the books and

9     records of the Stern Law Firm, and Fred Morris is telling

10    them -- telling us that those are kickback checks.  And

11    additionally the overwhelming majority of the legitimate

12    checks are deposited to First Quality's bank account, all of

13    the kickback checks are cashed at the check cashers.

14          THE COURT:  Okay.  Does that answer your question?

15          MR. BLUMROSEN:  Yes, Your Honor.

16          THE COURT:  All right.  Go ahead.

17   BY MR. BLUMROSEN:

18   Q    Did you visit with very many of the Stern clients during

19   your investigation?

20   A    I met with some, yes.

21   Q    Okay.  One of them was a client named Mr. Robinson.  Do

22   you recall that?

23   A    Yes, I do.

24   Q    And at that time you weren't sure whether or not his

25   medical treatment was, in fact, valid or was it bogus.  Do you

1    recall asking him about that?

2    A    I did ask him about that.

3    Q    Did you prepare a report in response to your interview

4    with Mr. Robinson?

5    A    I did.

6    Q    And, in fact, Mr. Robinson told you -- and you had all

7    the records, the ones you just described to the Court that you

8    used to make the determination of whether or not a claim is

9    valid or it's a kickback, but you went to Mr. Robinson's

10   apartment and you knocked on his door and you wanted to know

11   if he really had treatment, if he really had back surgery, if

12   he really went and got treatment.  Do you recall that?

13   A    I didn't have those records but I did ask him those

14   questions.

15   Q    You didn't have disbursement detail?

16   A    No.

17   Q    What records did you have when you met with Mr. Robinson?

18   A    I had copies of some checks that had been issued by the

19   Stern Law Firm, I had a driver's license photo of one of First

20   Quality's employees, and I think that's about it.

21   Q    How were you able to ask him about -- if he really had

22   back surgery?

23   A    Well, he told me had back surgery.

24   Q    Didn't you ask him though?

25   A    I don't remember.

1    Q    Okay.  It'll be detailed in your report of your interview

2    with him though.  Correct?

3    A    Yes.

4    Q    Okay.  Same questions I have regarding Mr. Radcliff's

5    company, which is Company Number 2.  That's throughout the

6    Indictment.  Correct?  You knew and admit, would you not, that

7    many, many of Mr. Stern's clients receive medical treatment at

8    Mr. Radcliff's Company Number 2.  Correct?

9    A    Yes.

10   Q    And they received legitimate medicate treatment from

11   injuries they sustained in accidents that they were involved

12   in.  Correct?

13   A    In many cases presumably, yes.

14   Q    I'm sorry?

15   A    In many cases presumably, yes.

16   Q    Okay.  Well, did you do any type of investigation to

17   determine whether Mr. Stern's law firm was filing fraudulent

18   lawsuits that weren't really accidents, that he was faking the

19   accidents?

20   A    We looked into some, yes.

21   Q    And did you find any?

22   A    Not that are in the Indictment, no.  We found some

23   evidence, but --

24   Q    Didn't have enough room to put it in the Indictment?

25   A    Didn't feel that the evidence was sufficient.

1    Q    The same question, you'd make the same determination

2    about what patients and what clients went to Company Number 2

3    to determine whether it was legitimate or whether it was

4    called a kickback.  Is that correct?  The same determination

5    you just told the Court about Company Number 1?

6    A    It's largely the same, it's a little bit different

7    because those checks were routed through Debra Bradley

8    (phonetic).  So again, if you look at the check stubs on

9    referral fees to Debra Bradley, because she did get some

10   payments from the Stern Law Firm for her services in that

11   manner, if there -- there were legitimate referral fees

12   contained in the books and records of the Stern Law Firm, a

13   reference to the client name and the client's case number.

14   The checks -- the larger checks that are written to

15   Ms. Bradley that are immediately followed by a check to

16   Wellness contain no such information.

17   Q    You're not saying that all checks the Stern Law Firm sent

18   to Mr. Radcliff's company went through Debra Bradley, are you?

19   A    No.

20   Q    You're just talking about a specific group of checks.

21   Correct?

22   A    Correct.

23   Q    Okay.  The majority of checks written to Company Number 2

24   you have no way of knowing whether those are legitimate or

25   whether they're kickbacks as you refer to them in the

Indictment?

A    I would say the majority of the checks are, in fact,

related to a patient that actually sought treatment there.

Q    Do you know how many Stern clients were treating at

Company Number 2?

A    I don't.

Q    Do you know who Scott Arena (phonetic) is?

A    Yes.

Q    Did he ride around with you during your investigation of

Mr. Stern?

A    He went on a couple of places with me, yes.

Q    He works for an insurance lobbying group?

A    He works for the National Insurance Crime Bureau which is

an investigative agency of private insurance companies

basically.

Q    Funded by the insurance industry.  Correct?

A    Correct.

Q    Okay.  And he's not in law enforcement now, is he?

A    No, he's not.

Q    So in driving around with you during your investigation

did you interview witnesses during your investigation with a

gentleman who works for an insurance lobbying group with you

in the car?

A    He doesn't work --

        MR. JOHNSON:  Misstates the testimony.

1          THE COURT:  Ask the question again.

2     BY MR. BLUMROSEN:

3     Q     Did Scott Arena join you on any interviews of witnesses

4     in this matter?

5     A     Yes, he did.

6     Q     Do you know Cory Allen (phonetic)?

7     A     I've never met Cory Allen.  I spoke to her once on the

8     phone.

9     Q     Do you know her husband, Raymond?

10    A     No, sir.

11    Q     Okay.

12    A     I believe he's deceased.

13    Q     You understand that Mr. Stern is a United States citizen.

14    Correct?

15    A     That's my understanding, yes.

16    Q     I'm assuming you've done an extensive background check on

17    Mr. Stern during your three- or four-year investigation of

18    him?

19    A     I have not sought out his immigration status.

20    Q     Okay.  You know he's lived in Houston for over 30 years?

21    A     Yes.

22    Q     You know he's been married to the same woman for over 27

23    years?

24    A     I know they've been married a long time.

25    Q     Okay.  You  reference the State Court solicitation of

1    capital murder during your testimony.  Do you recall that?

2    A    Yes.

3    Q    You know Mr. Stern was out on bond during that.  Correct?

4    A    Yes.

5    Q    And you know that case was dismissed.  Correct?

6    A    It was.

7    Q    You know it was dismissed for insufficient evidence.

8    Correct?

9    A    Insufficient corroboration of --

10            THE COURT:  You know, I --

11            THE WITNESS:   -- the witnesses is what it said.

12            THE COURT:   -- don't even want to get into that

13   other case, that's not part of this case.

14            MR. BLUMROSEN:  Yes, Your Honor.

15            THE COURT:  He was out on bond, and then is there

16   something else about that bond that you want to ask him?

17            MR. BLUMROSEN:  Yes, Your Honor.

18   BY MR. BLUMROSEN:

19   Q    You're aware that Mr. Stern was out on bond and made all

20   of his court appearances in that matter, are you not?

21   A    I'm not aware of that, but -- I don't know.

22            MR. JOHNSON:  Are you proffering that to the Court?

23            MR. BLUMROSEN:  I am proffering that, Your Honor.

24            MR. GERGER:  We will.

25   BY MR. BLUMROSEN:

1    Q    Do you know when Roy Abner started cooperation with the

2    Government approximately?

3    A    It was late 2017, maybe around October, November.

4    Q    Do you know when Fred starting cooperating with the

5    Government?

6    A    Late 2018.

7    Q    And Marcus Esquivel, do you know the date when he started

8    cooperating?

9    A    Late 2017.

10   Q    Okay.  And all the acts that you testified to when

11   Mr. Johnson was asking you about what you all allege are

12   obstructive or tampering with a witness, those are all going

13   to be based on people telling you that that are cooperating

14   with you.  Correct?

15   A    No, sir.

16   Q    It's based on Fred Morris's testimony of what Mr. Stern

17   asked him to do.  Correct?

18   A    Well, some of them, the June 30 $54,000 check to Frost

19   Bank that was converted to a cashier's check, nobody testifies

20   about that.  That's just a financial record.

21   Q    I'm asking specifically -- let's go specifically Fred

22   Morris, when he's telling you of -- what Mr. Stern asked him

23   to do, destroy records, things of that nature, you're getting

24   that from Fred Morris's mouth.  Correct?

25   A    Yes.

1    Q    There's not going to be any other documentary evidence,

2    there's not going to be an email, there's not going to be a

3    text, anything that you're aware of, it's just what Fred

4    Morris is telling you that that's what Mr. Stern asked him to

5    do.  Correct?

6    A    Yes.

7    Q    Same thing with Marcus Esquivel, what you testified to

8    about that Mr. Stern asked him to allegedly destroy documents,

9    is there going to be any evidence that we're going to hear

10   other than the testimony of Marcus Esquivel in that regard?

11   A    Regarding the request to destroy records?

12   Q    Yes.

13   A    No.

14   Q    There's not going to be --

15          THE COURT:  Wait a minute -- wait, wait, I just

16   don't want to muddy this up.  Are you asking is there going to

17   be any other witness statements as to that?  Because I mean I

18   heard that there's a USB drive that finds its way to Las Vegas

19   which indicates -- I mean it corroborates -- I mean I just

20   don't want to be making an unclear Record here.  What are you

21   asking exactly?  Is anybody else going to say that?

22          MR. BLUMROSEN:  Yes, Your Honor.

23          THE COURT:  Okay.  Because there is other evidence

24   of that.

25   BY MR. BLUMROSEN:

1   Q    Is there any other witness -- we know now there's no tape

2   of Mr. Stern saying anything in this matter that you're aware

3   of.  Correct?

4   A    Correct.

5   Q    But as far as the allegations in the Indictment of Marcus

6   Esquivel, you're getting that from his mouth.  Correct?

7   A    Yes.

8   Q    Anything else you're getting that from other than Marcus

9   Esquivel telling you that Jeff Stern told me to destroy

10  evidence?

11  A    No.

12  Q    Okay.  Same thing with Roy Abner.  Are you getting

13  anything from Roy Abner that he's telling you that Fred --

14  that Jeff Stern told him to do other than out of Roy Abner's

15  mouth and other documentary evidence?

16  A    Roy -- I mean other documentary evidence.

17  Q    Okay.  When is the last -- the allegations contained in

18  the Indictment talk about the last act of what you all are

19  calling an obstructive act was July of 2019 with Mr. Morris.

20  Is that correct?

21  A    Correct.

22  Q    Any other action by Mr. Stern with Mr. Morris since that

23  date?

24  A    Not that I'm aware of.

25  Q    Okay.  Mr. Esquivel says in 2017, his last point in the

Indictment, which is in Paragraph 164, 2016.  Is there any act

of obstruction that you want to tell the Court about with

Mr. Esquivel and Mr. Stern since that date?

A    No.

Q    In the evidence that you offered regarding Mr. Esquivel

saying that Mr. Stern said he was going to take care of his

family if anything happened to him, that's coming out of

Mr. Esquivel's mouth and that's the only source of that.

Correct?

A    Yes -- well, there are checks from Mr. Stern to

Mr. Esquivel's family after that point, but my understanding

is they're referrals, or payments for referral of cases.

Q    Well, then also were you aware that Mr. Stern's law firm

represented Mr. Esquivel's family in a personal injury

lawsuit?

A    I was aware that Mr. Stern represented Belinda Esquivel

in a personal injury lawsuit.

Q    Any other what you want to call acts of obstruction by

Mr. Stern after this November 2016 meeting with Mr. Stern and

Mr. Esquivel that's contained in Paragraph 164 of the

Indictment?

A    Not that I'm aware of.

Q    Paragraph 166 of the Indictment alleges that Mr. Stern

offered Roy Abner football tickets and concert tickets.  Have

you read that?

1    A    I did.

2    Q    Do you believe that's obstruction --

3         THE COURT:  Okay.  Can we take a pause?  Do you need

4    to get your hand out of there?

5         DEFENDANT STERN:  No, I'm --

6         THE COURT:  Do you need them to unlock your hand for

7    a minute?

8         DEFENDANT STERN:  I can -- we're almost done, I

9    think I can --

10        THE COURT:  It's okay.  I meanm can you just unlock

11   his hand for a minute --

12        DEFENDANT STERN:  Thank you very much.

13        THE COURT:   -- if he needs to take a note or

14   scratch his nose or something.

15        DEFENDANT STERN:  Thank you.

16        THE COURT:  It's been a long year.

17        Go ahead.  Thank you.

18      (Pause in the proceedings.)

19        THE COURT:  I didn't hear the last question and

20   answer, I was busy looking at him, so can you just do that

21   again?  I'm sorry.

22   BY MR. BLUMROSEN:

23   Q    Do you believe -- in Paragraph 166 of the Indictment

24   Mr. Stern -- it says that Mr. Stern offered Attorney 1, which

25   is Roy Abner, football tickets and concert tickets.  Correct?

1   A    Yes.

2   Q    And you believe that's an act of obstruction or tampering

3   with a witness?

4   A    Yes, I think it was made in the context of keeping

5   Mr. Abner happy and cooperating with Mr. Stern.

6   Q    And what do you base that on?

7   A    The totality of evidence in the case.

8   Q    Did Mr. Arena help you interview any witnesses in the

9   matter?

10   A    Yes.

11   Q    Which witnesses did Mr. Arena help you interview?

12   A    I think he sat in with Sophia No (phonetic), and there's

13   at least one other whose name I can't recall that was a former

14   client.

15   Q    Did you document that in the report that you have with

16   that interview?

17   A    Yes.

18   Q    And how did you get in contact with Mr. Arena?  Did he

19   reach out to you?

20   A    I think I probably reached out to him because I had

21   worked with the National Insurance Crime Bureau previously on

22   similar cases.  They had the ability to obtain records and so

23   I probably reached out to him.

24   Q    Okay.  Did you interview Michelle Geyser (phonetic)?

25   A    I did.

1    Q    How many times have you interviewed her?

2    A    Three.

3    Q    Do you find her to be a credible witness?

4    A    You know what, I think he went with me -- Scott Arena was

5    also with me one time I interviewed Michelle Geyser.

6    Q    Do you find Ms. Geyser to be a credible witness?

7    A    For the most part, yes.

8    Q    Have you don't any background check on her?

9    A    No.

10        MR. BLUMROSEN:  May I have a moment, Your Honor?

11        THE COURT:  Sure.

12    (Pause in the proceedings.)

13        MR. BLUMROSEN:  Pass the witness, Your Honor.

14        THE COURT:  Redirect?

15        MR. JOHNSON:  Very briefly, Your Honor.

16        THE COURT:  Uh-huh.

17        REDIRECT EXAMINATION OF ROBERT SIMPSON

18    BY MR. JOHNSON:

19    Q    Sir, you were asked a series of questions about whether

20    or not you knew that -- if there was going to be additional

21    evidence about certain things in the case.  Do you remember

22    that line of questioning?

23    A    Yes.

24    Q    One of the questions was about is there going to be

25    additional evidence of obstruction.  Do you remember that

1    question?

2    A    Yes.

3    Q    Is this an ongoing investigation?

4    A    It is.

5    Q    Is it possible that the ongoing investigation will, in

6    fact, turn up future evidence of obstruction?

7    A    It's possible, yes.

8    Q    You were asked a series of questions about Mr. Stern's

9    international travel.  Do you remember those questions?

10   A    Yes.

11   Q    And I think the defense proffered that Mr. Stern had

12   traveled internationally I think it was maybe six times since

13   this investigation has been going on?

14   A    Yes.

15   Q    Something to that effect.  During the time that Mr. Stern

16   traveled, including this most recent time when you arrested

17   him when he returned from his travel, was Mr. Stern aware that

18   as far as you that Mr. Morris was cooperating against him?

19   A    He was not.

20   Q    Was Mr. Morris Mr. Stern's closest case running associate

21   as far as you know?

22   A    Yes.

23   Q    Did he -- did Mr. Stern know that Mr. Morris had not

24   destroyed the ledgers as Mr. Stern had directed him to do?

25   A    Not that I'm aware of.

1    Q   Did Mr. Stern know that Mr. Esquivel had not destroyed

2    the ledgers as Mr. Stern had directed him to do?

3    A   Not that I'm aware of.

4    Q   And did Mr. Stern, as far as you know, was he aware that

5    there was an undercover operation in which on recording were

6    captured conversations between Morris and Abner in which they

7    discuss Stern's involvement and responsibility to pay for the

8    lost tax returns?

9    A   No.

10   Q   Do you think now, knowing about that evidence, that that

11   could change Mr. Stern's incentive to flee?

12          THE COURT:  So that will be a question that I'll

13   answer.  Okay.

14          MR. JOHNSON:  Yes, Your Honor.

15   BY MR. JOHNSON:

16   Q   You were asked a series of questions suggesting that

17   Mr. Stern didn't know that he couldn't deduct referral fees,

18   the legal referral fees.  Do you remember those questions?

19   A   Yes.

20   Q   Specifically referral fees to non-attorneys.

21   A   Yes.

22   Q   Is there evidence from the investigation that suggests

23   that Mr. Stern did, in fact, know that those were improper

24   deductions?

25   A   Yes.

1    Q    Okay.  Why don't you tell us some of that.

2    A    Information provided by the State Bar to attorneys

3    regarding Bare Tree (phonetic) and what constitutes Bare Tree

4    and what doesn't, Indictments of local attorneys for Bare

5    Tree.

6    Q    And what things did Stern do in the case to suggest that

7    he knew what he was doing was improper?

8    A    Well, he specifically orchestrated the scheme so that the

9    checks would be written to other attorneys and then deducted

10   as referral fees as opposed to simply doing it any other way.

11   Q    Right.  So what other ways could have paid these case

12   runners and try to deduct those payments?

13   A    Well, he couldn't deduct the payments.

14   Q    Right.  But if he had -- well, he could, he could deduct

15   them on his taxes and then he'd be in trouble.  Right?

16   A    Right.

17   Q    Okay.  So what other ways could he have paid the runners

18   besides running the money, funneling the money through other

19   attorneys?

20   A    He could have simply written checks to himself or to cash

21   and taken the cash and paid the runners.  There's various

22   other ways he could have done it.

23   Q    Right.

24   A    But he would have wound up owing taxes.  He could have

25   just written checks to the -- to Marcus Esquivel --

1    Q    Right.  If --

2    A     -- or to Fred Morris or --

3    Q     -- if there's nothing wrong with paying Marcus Esquivel

4    and Fred Morris, why not just write them a check?

5    A    Right.

6    Q    Did Mr. Stern do that?

7    A    No, he didn't.

8    Q    No, he wrote the checks in the names of attorneys.

9    Right?

10   A    Correct.

11   Q    What does that tell you?

12   A    That he sought to deduct those payments as referral fees.

13   Q    Right.  Because you can't deduct payments to non-

14   attorneys.  Right?

15   A    Correct.

16   Q    Whereas you can deduct payments to attorneys.

17   A    Well, you can't deduct illegal payments to non-attorneys.

18            MR. JOHNSON:  Pass the witness.

19            MR. BLUMROSEN:  Very briefly.

20            THE COURT:  Go ahead.

21            RECROSS-EXAMINATION OF ROBERT SIMPSON

22   BY MR. BLUMROSEN:

23   Q    Mr. Stern wrote many checks to Marcus Esquivel, did he

24   not?  Let me --

25   A    I don't remember --

1    Q    -- rephrase it.  Did he write checks to Marcus Esquivel?

2    A    I don't remember any.  He wrote a lot of checks to

3    entities controlled by Mr. Esquivel.

4    Q    Do you want this Court to believe that the power of the

5    federal government was incapable of taping a phone call or any

6    other recording of Jeff Stern's voice during the pendency of

7    this investigation?

8    A    That we didn't have the power to do that?

9    Q    Have the ability to do it.

10   A    Well, we didn't feel it was safe for the witnesses and it

11   was not a good idea.  Mr. --

12   Q    What about -- I'm sorry.

13   A    -- Esquivel indicated to us that he had a phone call

14   with Mr. Stern in which Mr. Stern indicated to him that he

15   understood Esquivel had done something very bad and that Stern

16   was not going to be talking to him anymore.  So that kind of

17   rolled that one out.  And then I think I discussed earlier the

18   situation with Mr. Morris.

19   Q    Sure.  What about a wire tap?

20   A    That's hard to do when phones are being changed every

21   month.

22            MR. BLUMROSEN:  No further questions, Your Honor.

23            THE COURT:  All right.  Anything else?

24            MR. JOHNSON:  No, Your Honor.

25            THE COURT:  Can he step down?

1          MR. JOHNSON:  Yes.

2          THE COURT:  All right.  Don't leave yet, just step

3   down and hang out here until we're done.

4          THE WITNESS:  Yes, Your Honor.

5    (Witness steps down.)

6          THE COURT:  Do you have any other witnesses or

7   evidence?

8          MR. JOHNSON:  No, Your Honor.

9          THE COURT:  Do you rest?

10         MR. JOHNSON:  Yes.

11         THE COURT:  Do you have witnesses or evidence?

12         MR. JOHNSON:  Well, we have a proffer I can do now

13  or we can do an argument.  Up to you.

14         THE COURT:  No, you should do it now, that's your

15  evidence, so your proffer is your evidence.  Are you going to

16  call any witnesses?

17         MR. GERGER:  No, but I --

18         THE COURT:  All right.

19         MR. GERGER:   -- just would like to introduce the

20  witnesses who came very briefly.

21         THE COURT:  That's fine.

22         MR. GERGER:  Your Honor, Mr. Stern's wife, Yvonne,

23  is here.

24         Would you just stand very briefly?

25         His stepson Richard is here, Your Honor; his sister-

in-law, Teresa Flores, is there; his sister, Lisa Goldstein,

is here.   All of these people live in Houston, Your Honor.

Did I miss anybody?

THE COURT:  I will take it --

MR. GERGER:  We've got Tammy and -- Tammy and

Caitlyn Saragusa (phonetic), friends of the family are here.

THE COURT:  Okay.

MR. GERGER:  The only other proffer we would make,

Your Honor, is in the binder in front of you, and given to the

Government, you already have Exhibit 5 in front of you for

consideration, Your Honor, and I just want to make sure you

have a good record.  That Exhibit 5 of course were the emails

where we tell the Government that Mr. Stern is going on a

trip, tell them the flight numbers, when he's coming back, et

cetera.  That's when was arrested.

But before that, Your Honor, many times this year we

have -- Mr. Stern has offered to the Government to surrender

voluntarily without the need to take officers off the street

to arrest him, and Exhibit 4 is an example of that, it's a

letter to the Department of Justice in April, there are other

examples where we've offered to surrender.

And in anticipating of that of course we provided

the Pretrial Office with the information that they would put

into a pretrial report to speed along the preparation of a

report.  I still call it pretrial, but to the Probation

Officer for the preparation of a pretrial report.  And

Exhibit 2 is an example of that in 2018, Exhibit 3 is an

example of that from 2019.

And as far as the bond in the prior case, attached

to Exhibit 2 are the court papers from the prior State case

showing that Mr. Stern was released on bond in that case, made

all of his court appearances, and then the case was dismissed.

Finally, Your Honor, Exhibit 1 are simply three

letters from people in the community who talk about

Mr. Stern's involvement in the community for many, many years.

So we'd offer all of these into evidence.  We would

ask that 2 and 3 be filed under seal because they contain the

information that would be in a sealed pretrial --

THE COURT:  Did you file these already?

MR. GERGER:  I haven't, but I can -- I wanted to get

to a --

THE COURT:  Just file the whole thing under seal.

MR. GERGER:  Great.

THE COURT:  And granted.  And for the public's

edification, that's because there's a lot of personal

identification information and other personal information.

Correct?

MR. GERGER:  Yes, Your Honor.

THE COURT:  That's what will be in here?  All right.

Okay.  Go ahead.

1          MR. GERGER:  Finally, Your Honor, the Pretrial

2     Services Report we've reviewed and there are two changes to

3     that in case this ever became an issue.  We disclosed to the

4     Pretrial Office a 30 year old -- a memory anyway of a 30 year

5     old misdemeanor arrest.

6          THE COURT:  I'm not worried about that.

7          MR. GERGER:  There's no record of it in the public

8     system, but we wanted to be complete.  And the cash on hand,

9     if you add up money markets, et cetera, we think it's actually

10    about $500,000 rather than the different accounts that are

11    tallied up and I --

12         THE COURT:  Which line are you talking about?

13         MR. GERGER:   -- we know that --

14         THE COURT:  Where are you?

15         MR. GERGER:  Well, if you look at assets, there's a

16    personal savings account --

17         THE COURT:  Right.

18         MR. GERGER:   -- there's a personal checking

19    account.

20         THE COURT:  What's the pension from?  Maybe I'm

21    missing something.

22         MR. GERGER:  I can find out, Your Honor, but I don't

23    know the answer to that.

24         THE COURT:  This is carried.  Okay.  Whatever.

25         MS. McFARLANE:  It's the law firm, Your Honor.

1          MR. GERGER:  It's the law firm pension.  Thank you.

2     That's all --

3          THE COURT:  Is that it?

4          MR. GERGER:  That's it --

5          THE COURT:  All right.

6          MR. GERGER:  -- for the evidence.

7          THE COURT:  Thank you.  And so do you rest?

8          MR. GERGER:  We do.

9          THE COURT:  All right.  Argument, Government first,

10    please.

11         MR. JOHNSON:  Yes, Your Honor.

12         CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

13         MR. JOHNSON:  Your Honor, the Government contends

14    Mr. Stern is both a flight risk and a risk of -- he is a

15    danger to the community.  But most importantly he is a risk,

16    he'll continue to obstruct justice.  There is a long and

17    detailed track record of Mr. Stern's efforts to obstruct this

18    investigation and other investigations.

19         The false checks in this case started at least by

20    2006.  So that's 13 years of checks where he's indicating on

21    the check a payment is made to one person, usually Roy Abner,

22    in reality the check is going to someone -- in reality the

23    money from that check is going to someone else.  That's 13

24    years of lies to the banks about who's getting the money.  To

25    suggest to anyone who looks at those checks that money did not

go to Mr. Morris.  13 years that's been going on.

He's filed eight false -- caused Abner to file false -- eight false tax returns, one false Offer in Compromise, and a false -- and the Stern Law Firm has filed a false 1099 suggesting that it had paid Abner income that Abner didn't receive.  He did that every year from 2011 to 2018. There's this ongoing effort to create a false record, which is happening at the same time that Mr. Stern is doing his best to destroy the real record.  He's telling Morris to destroy the case ledger that was written in Mr. Stern's own hand that shows the kickbacks that Mr. Stern paid.  He ordered Esquivel to destroy his ledgers that tracked kickback payments from Stern to Esquivel or Stern clients.  So he's doing both, creating a false record and destroying the real record.

The Court can really have no expectation that this Defendant can comply with a term of release when there's this level of obstruction going on.  And it's not just the obstruction that's the problem.  There's also this overarching theme of inability to comply with any order from a government entity.  The whole scheme is based on violations of the Texas Rules of Ethics as they apply to lawyers, Texas state law that prohibits barratry.

Mr. Stern was audited in 2010 by the IRS Civil Division.  And was his response to that audit to stop his tax evasion scheme?  No, it was the opposite.  His response was to

work around the audit filings.  So he stopped issuing checks to Marcus and Broussard to whom he couldn't issue a 1099 and he starts issuing 1099s to Abner and having Abner file false tax returns, and the scheme continues.  He just works around what the Government entity tells him he's supposed to be doing.

And so then in this case there are, I believe it's 42 overt acts counted in the Indictment that occur after Mr. Stern knows he's under federal Grand Jury investigation, after he's retained attorneys in that case -- or that investigation, and after those attorneys had corresponding with the United States Attorney's Office.  And not only do the overt acts continue, they actual accelerate during that time period because Mr. Stern is scrambling to paper over the record.

There's a flurry of tax -- false tax returns filed for Abner right after Grand Jury subpoenas go out, and then there's a series of payments to Abner to try to pay for the Offer in Compromise.  Stern has to try to do it three different ways, but he finally gets the Offer in Compromise paid for.

And, you know, the creation of a false record just continued during the entire time period after he learns of the investigation.  In fact, the last overt act occurs in -- the last overt act were counted in the Abner-Morris part of the

1    Indictment is the final 1099 that Mr. Stern issues that was

2    issued -- I think it was received by the IRS in April of this

3    year.

4         I actually had to go back, I was writing the

5    Indictment I actually had to go back and add an overt act into

6    the Indictment because Mr. Stern had just committed another

7    overt act in furtherance of the conspiracy.  And the

8    Indictment is going to be edited as it's written to account

9    for Mr. Stern's ongoing efforts to create a false record.

10         With this level of effort at obfuscation and failure

11    to comply with any rules from any government entity, you

12    cannot expect Mr. Stern to comply with the rules of this

13    Court.  And one of those rules, if he's released on bond, is

14    to show up.  And given his behavior with obstruction and

15    failure to comply with rules of anyone else, I don't think you

16    can expect Mr. Stern to comply with that rule.  That's all I

17    have, Your Honor.

18              THE COURT:  All right.

19         CLOSING ARGUMENT ON BEHALF FOR THE DEFENDANT

20              MR. GERGER:  Your Honor, of course the crime of

21    obstruction of justice was considered by Congress, and as a

22    presumption of unsecured bond.  Even cases of violent

23    obstruction, threats of obstruction, threats to witnesses

24    result in release.  We cite cases in our brief, and I would

25    just add to that the *DeNinzio* (phonetic) case, which I can

1  hand to the Court and the Government, where even a La Cosa

2  Nostra member with a reputation for violence against witnesses

3  was released on bond in Boston.  Why?  Because the Court said

4  to predict future obstruction is a very impermissible thing

5  to.  I think there's an argument that it's --

6         THE COURT:  So I can never detail anybody whoever

7  has a pattern of obstruction because I can't possibly know for

8  100 percent certain that they're never going to obstruct

9  again, that's how you read that case?

10        MR. GERGER:  I would read it as saying in that case,

11 a person with a history of threats against witnesses, a

12 history of violence the Court said there's not in that case

13 clear and convincing evidence that he won't show up for trial

14 or that he will threaten witnesses in the future.  And that's

15 the situation here.  What's the evidence of witness tampering

16 here, because that's the obstruction.  With Esquivel we have

17 Esquivel's word of something that ended two years ago.  You

18 hear there is no threat at all to Esquivel and no even attempt

19 at tampering since 2017.

20        THE COURT:  Do you think I have to find an actual

21 threat?  Because I mean --

22        MR. GERGER:  No.

23        THE COURT:   -- some of your -- the cases -- the way

24 that you wrote your motion was as if, if there's no threat of

25 violence, then, you know, I can't find that he would --

1    that -- in other words under the part of the Bail Reform Act

2    where it talks about obstruction and threats and things like

3    that, you seem to be saying in your motion papers that I have

4    to find a threat of violence.  And I don't agree with that.

5          MR. GERGER:  I didn't find a case, Your Honor, of --

6    where there was no violence, where there was a detention based

7    on a future prediction that somebody would do something else.

8    Right?  And what we know from Esquivel is there's no tampering

9    since 2017, that's what's alleged.  So I don't think Esquivel

10    is an issue.

11          With Morris we have no tape recording, no text, no

12    email, we have Morris's word that he was told to destroy

13    something.  I get that that's the allegation.  And what these

14    cases say is that under Court supervision that's the game

15    changer.  And I don't think there's any risk of flight.  I

16    think you don't -- you can't find a risk of flight, Your

17    Honor.  He is a US citizen, he's lived here his whole life.

18    He has a law firm, he has legitimate cases.

19          I would tell the Court -- I didn't do this in my

20    evidence, but we ran a search of how much of his current

21    business is because of Morris and Abner.  It's 7 percent.

22    Well, this is not a case where somebody is running a general

23    illegal enterprise.  The current docket is 93 percent from

24    other sources.

25          So he will obey with your orders to appear at court,

1    just like he did in the prior case where he was facing a much

2    longer term.  That case was dismissed.  He offered to

3    voluntarily surrender, he's provided a full disclosure of his

4    assets, there's no question about that.  And we rely on the

5    Pretrial Services Report who says in all their experience they

6    think they can supervise this person.

7              So if Your Honor is concerned about tampering with

8    Morris --

9              THE COURT:  Just so we can be clear, I just want

10   everybody in this whole room to know, and anybody who reads

11   anything about this, that the Pretrial Services Office

12   specifically puts a little bold thing at the top to make clear

13   that several factors fall solely within the providence of the

14   judicial officer are not to be considered by the officer.

15   Those factors include the weight of the evidence.  And there's

16   no rebuttable presumption here and potential penalties.  They

17   simply -- they don't even look at the facts of the case.  I

18   just want it to be clear --

19             MR. GERGER:  Understood.

20             THE COURT:   -- that this recommendation is only

21   that.  All right.

22             MR. GERGER:  Well, the cases we cite in our brief

23   include *Madoff* and *Manafort*.  Right?  Who are people who

24   were --

25             THE COURT:  Look what happened to Manafort, if

1    you're going to bring it up.

2          MR. GERGER:  Well, you know, I do bring it up

3    because he was released on bond.  And there will be --

4          THE COURT:  I don't know the facts of that case.  Do

5    you know the facts that happened, that were in front of the

6    judge there?  Was there any obstruction that was noted before

7    he was -- he had his bail hearing?

8          MR. GERGER:  I think there was.  I don't have that

9    transcript --

10         THE COURT:  All right.  Neither one of us knows, so.

11         MR. GERGER:  Right.

12         THE COURT:  Okay.

13         MR. GERGER:  But of course there was certainly the

14    accusation that he was tampering with witnesses I believe

15    before he was released on bond.  And then what's going to

16    happen if Mr. Stern reaches out to Mr. Morris, who's

17    cooperating and has pled guilty?  What's going to happen?

18    Mr. Morris is going to -- and his lawyers are going to call

19    Mr. Johnson, we're going to be right here and you're going to

20    jail Mr. Stern.  So the risk that Mr. Stern is going to tamper

21    with Fred Morris is zero I would say, but is certainly not

22    proved by clear and convincing evidence.  So that's the only

23    witness we've learned of.

24         If you think other restrictions are required, then

25    he will follow them.  Whether that's a limit on email or

whatever.  But the only witness we have is Fred Morris, who

has anything reasoned.  And I would say that there's no risk

that he's going to tamper with Fred Morris.  So that's our

position, Your Honor.

THE COURT:  All right.  Is there a response to that

or is everybody done?

MR. JOHNSON:  Judge, I would just point out that as

they've said, that's a two-inch thick binder full of witness

reports, there's a ton of witnesses in this case, any one of

which could be tampered with.

THE COURT:  Yes, sir.

MR. JOHNSON:  Fred Morris is not the only witness in

the case.

THE COURT:  I hear you.  Is there a response to that

limited notion?

MR. GERGER:  If there had been a whiff of it up

until this point, I guess I would embrace that.  There's a

binder full of witnesses that could have been tampered with up

until yesterday.  How many tabs are in the binder?

MS. McFARLANE:  75.

MR. GERGER:  75.

THE COURT:  All right.

MR. GERGER:  Thank you.

MR. JOHNSON:  And we have not disclosed to Mr. Stern

who all the witnesses are against him.  He doesn't know who

the--

THE COURT:  All right.  I get it.  Is there anything else from anybody?  I don't mean to shut you down, I'm here to listen.

(No audible response.)

THE COURT:  Are we done?

MR. GERGER:  Yes, sir.

COURT'S RULING

THE COURT:  Well, I don't think actually this is a closed case at all.  I think that -- and, you know, the evidence is what it is, I'm not going to sit here and review it with everybody, but it appears to me that Mr. Stern has adjusted his conduct over a period of years to avoid getting in trouble.  So he's doing this scheme, he gets audited, he changes the scheme.

He finds out that, you know, people are being interviewed by the Government, he confronts witnesses, he asks them questions, he's trying to get into and underneath what is happening in the Government's case, he's asking people to destroy documents.  It's more than one source, it's not just one person who says he destroys documents.  It's not just one person's word because there's a USB drive that finds its way to Arizona.

There are documents in a storage shed that's under the whatever, the illegal alien worker's name.  He's hiding

documents, he's destroying documents, he's changing the narrative, he's driving the narrative. He is, up until April apparently of this year, still doing the exact same thing. That he's got four qualified lawyers advising him on, and I don't know what all you've said to him and I'm not inferring that, I'm just saying he's got counsel and he's doing this, and he continues to do it.

I cannot imagine any condition that he would follow. I truly can't. I cannot imagine that a person who's literally paying fraud penalties, pays the penalty and then figures out a better way to do it. This is -- and so in my view it's not closed.

And I will tell you just as a legal matter and, you know, I'm reading *US v LaFontaine*, which is a 2nd Circuit case that's 210 F.3d 125, and they make very clear, it's in a slightly different context but, you know, obstruction of justice is a traditional ground for pretrial detention by the Courts, even prior to detention for dangerousness, which was instituted by the <u>Bail Reform Act of 1984</u>.

I would also say that the older the cases get, the less that the Courts were understanding what the Bail Reform Act says. And the Bail Reform Act says that if a person -- if by clear and convincing evidence there are no conditions or combination of conditions that will assure the safety of the community, meaning that he's not going to commit other crimes,

and these are crimes, obstruction is a crime, it's not just something that's going on inside the case. Obstruction of justice is a crime. In fact, that's one of the very things that the statute forces me to read to everybody who I let out on bond. I'm supposed to literally cite these intimidation and tampering statutes, obstruction statutes. It's one of the very things that the Bail Reform Act is concerned with.

And so -- and the integrity of the Government's investigation is important. I weigh that against the ability of a person to be out on bail pending trial who's not yet been found guilty. I fully understand that. But it is my position, and you can take it up with Judge Rosenthal, that there are no conditions by clear and convincing evidence because you've not undermined the credibility of a single one of these witnesses, you've not told me that they're lying, so I find by clear and convincing evidence that there are no conditions or combination of conditions that I could set that would assure the safety of the community in the sense that he's not going to come out and do this stuff again, that he's not going to talk to witnesses, that he's not going to burn documents, that he's -- I don't know if there's other documents. I don't know if there's another warehouse, I have no idea.

But it seems to me like he's going to continue this A. B, I find by a preponderance of the evidence that now that

he is here and he is in custody and he's hearing all of this
evidence, he's facing a substantial sentence if convicted, he
has significant wherewithal to leave and not come back, he
sess that the weight of the Government is against him.  And I
find at least by a preponderance of the evidence, and also
based on the fact that I don't think he's going to follow my
rules, that he's a risk of flight.

And I think you had some kind of response to
something I said.

MR. GERGER:  Please, Your Honor.

THE COURT:  You're welcome to, but that's my ruling.

MR. GERGER:  Well --

THE COURT:  So make your Record.

MR. GERGER:   -- I hear you, Your Honor, and -- but
before the gavel comes down I would ask you to consider this,
so that he can prepare for trial may I suggest this condition,
if he is ordered to home confinement with a monitor, and as in
child pornography cases as they do, monitoring his
communications I would ask you please to allow that, Judge, so
that we can have the access to him that we need for him to
prepare for trial.  And if he is restricted in that way, and
we have his passport to surrender, I'd ask you to sort of put
aside for a second a more generalized frustration about Jeff
Stern and the conduct that's alleged.  We can't rebut it in
this hearing.  We didn't even have time to read the agent

1    reports.

2         THE COURT:  Well, I have you a chance to have a

3    continuance --

4         MR. GERGER:  Well --

5         THE COURT:   -- so we're not going to hold that --

6    we're not doing that.

7         MR. GERGER:  And what I'd like to focus on though is

8    the fact that of course we are not in a position today to

9    rebut the charges that we disagree with.  But to focus just on

10   is he going to run away when he has all these characteristics

11   here where his wife is willing to sign a bond, where his

12   sister is here to co-sign a bond, where he will pledge

13   whatever assets you need to be pledged, where he will

14   surrender his passport.  I don't think that he's a risk of

15   flight.  He was facing a more severe sentence in the last

16   case.  And if he is confined to his home --

17        THE COURT:  And he destroyed documents back then

18   too.

19        MR. GERGER:  Well, that's the -- that's what

20   somebody said to the agent, and -- but what does he have --

21   there's nothing to destroy now, Your Honor.

22        THE COURT:  I don't know that.

23        MR. GERGER:  Well, but there's not any proof of what

24   there is to destroy, and they have his returns and they have

25   these witnesses and they have these ledgers.

1          THE COURT:  There's evidence that documents are

2    being hidden.

3          MR. GERGER:  Well, I don't know what those are, Your

4    Honor, and --

5          THE COURT:  They're the documents that were in the

6    warehouse under the landscaper's name.

7          MR. GERGER:  And that was searched and that have

8    that warehouse.

9          THE COURT:  And hear you and it just -- it shows

10   part of a pattern of hiding documents, of destroying

11   documents, of shaping the narrative in his case to defend

12   himself using a false set of facts.  He's creating a false set

13   of facts, he's using the IRS to create a false set of facts to

14   defend himself.  It's designed to fit the facts as he knows

15   them.  And as he learns more facts, he can continue doing

16   that.  That's the problem.  I hear you.  Thank you.

17         MR. GERGER:  But that's a practical solution I'm

18   asking you to propose.

19         THE COURT:  I disagree with you.  Thank you.

20         Sir, you're remanded to the custody of the marshals.

21   It'll take me until some point tomorrow to write an order so

22   when you appeal this it -- my order might not be on the Record

23   by then.

24         Okay.  Anything else?

25         MR. JOHNSON:  No, Your Honor.

THE COURT:  All right.  You're excused.

(Proceedings adjourned at 4:25 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*    /S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #60778*

*DATE FILED:  AUGUST 24, 2019*